UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISIONS

| | |
|---|---|
| IN RE: § | |
| § | CASE NO. 16-10661 |
| WHISTLER ENERGY II, LLC, § | |
| § | CHAPTER 11 |
| DEBTOR. § | |

**DECLARATION OF RICHARD DIMICHELE
IN SUPPORT OF FIRST DAY PLEADINGS**

I, Richard DiMichele, declare the following to be true and accurate under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am over the age of 18 and am fully competent to make this declaration ("Declaration"). I am the Chief Restructuring Officer of Whistler Energy II, LLC ("Whistler" or the "Debtor"). In such capacity, I am generally familiar with the Debtor's business and financial operations.

2. I submit this Declaration in support of the consent to the order for relief by the Debtor under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the motions and applications for related relief filed as of May 23, 2016 or concurrently herewith (collectively, the "First Day Pleadings").

3. I have reviewed the First Day Pleadings and, to the best of my knowledge, formed after reasonable inquiry, I believe that approval of the relief requested therein is necessary to minimize disruption to the Debtor business operations and preserve and maintain the value of the Debtor estate. I also believe that absent immediate access to cash collateral and authority to make certain essential pre-plan payments and otherwise continue conducting ordinary course business operations as set forth herein and described in greater detail in the First Day Pleadings, the Debtor would suffer immediate and irreparable harm to the detriment of its estate.

4.      All the facts and opinions set forth in this Declaration regarding the Debtor's finances and business affairs are based upon my review of relevant documents, information provided to me or verified by other executives or employees, conversations with other members of the Debtor management, and my experience and knowledge in the oil and gas industry generally.

5.      On May 6, 2016, Mr. Scott Frankel ("Former CEO"), the founder of Whistler and Chief Executive Officer, was separated from Whistler. The Former CEO principally handled communications with lenders and investors.

6.      The Board of Managers then appointed Mr. Robert Wichert, who is the Chief Operating Officer, to also serve as Acting Interim President and Chief Executive Officer.

7.      On May 10, 2016, Whistler engaged the services of TDF Partners LLC ("TDF") to provide restructuring advice. I was appointed as the Chief Restructuring Officer for Whistler.

8.      Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change. In an effort to conserve general and accounting expense, many of the accounting functions have been contracted out and the internal staff was pressed to adequately manage budgeting, finance, and vendor payment processing. Additionally, as cash flow became constrained due to loss of revenue and failed financings, the day-to-day challenges on the accounting staff increased. Significant effort was expended every year in working with the company outside auditors, but due to non-payment of the 2015 audit fee, Whistler does not have a finalized set of audited financial statements for 2015. In the short time that TDF has been engaged, I have spent significant time building realistic cash flow forecasts and testing and improving the financial reporting.

9.      If called to testify, I would testify to the facts and opinions set forth herein,

including the qualifications set forth above, based upon my personal knowledge, my review of relevant documents, and my investigation to date as Chief Restructuring Officer. I am authorized to submit this declaration on behalf of the Debtor.

10. Part I of this Declaration provides an overview of the Debtor's capital structure and financial standing. Part II of this Declaration sets forth the facts relevant to the various First Day Pleadings and the Debtor's business judgment in seeking such relief. Part III of this Declaration sets forth my bases for concluding that the relief requested in the First Day Pleadings is in the best interests of the Debtor, its estate and creditors, and all parties in interest.

## I. FINANCIAL OVERVIEW

### A. Assets

11. The Debtor's assets include its oil and gas leases (100% of the working interests in the Lease OCS-G 04940, Green Canyon Block 18 ("GC 18") and Lease OCS-G 14021, Green Canyon Block 60 ("GC 60"), and Lease OCS-G 05809, Ewing Banks Blocks 944/988 ("EW 944/988") as well as 45% interest in the Lease OCS-G 34961, Green Canyon Block 19 ("GC 19"). From these leases, per the Ryder Scott report dated January 1, 2016, the net PV 10% value of Debtor's reserves (inclusive of asset retirement obligations) was $92 million as of December 31, 2015 using then-current NYMEX prices. The Debtor also has approximately $75 million in several USB accounts, which secures the decommissioning bonds for its oil and gas lease obligations and such bonds are in favor of third parties, including the U.S. Government.

12. The Debtor also has crude oil and gas production from its producing wells. The Debtor produces approximately 2,500 barrels per day, which provides a net revenue of $2,000,000 per month.

8717797v.3

**B.      Secured Notes**

13.     In 2013, Whistler issued $90 million of senior secured Tranche A Notes due 2016 ("2016 Notes")  pursuant to that certain Note Purchase Agreement dated as of July 11, 2013, by and among Whistler, as issuer, several Apollo entities as holders (Apollo Franklin Partnership, L.P., Apollo Centre Street Partnership, L.P., Apollo Service Opportunities Managed Account, L.P., Apollo Credit Opportunity Fund III AIV I LP, and ANS Holdings (WE), Ltd., collectively the "Apollo Holders"); and The Bank of New York Mellon, as Administrative Agent, (in its capacity as Administrative Agent, the "NPA Agent") (as heretofore amended, restated, supplemented or otherwise modified, the "Note Purchase Agreement").  The 2016 Notes are secured by liens on substantially all of the assets owned by the Debtor.  Whistler paid down a portion of the 2016 Notes.  Then, in October 2014, Whistler entered into the First Amendment of the Note Purchase Agreement.  Whistler then issued Additional Tranche A Notes in the aggregate amount of $45,788,034.  Interest is at the rate of 14% and has been deferred.  The maturity date under the 2016 Notes is June 11, 2016.

14.     On May 19, 2016, the Apollo Holders provided a bridge loan to Whistler in the amount of $500,000 to pay restructuring professionals and for other corporate purposes.

15.     As of May 2016, the Debtor's liability under the 2016 Notes is $125,500,000 plus accrued, unpaid interest and other costs.

16.     Pursuant to the Note Purchase Agreement and the Guarantee and Collateral Agreement dated July 11, 2013 between Whistler and The Bank of New York Mellon, as the Collateral Agent for the Apollo Holders, the Apollo Holders hold a first lien on substantially all of the Debtor's assets, including the reserves, any production from such reserves, all cash, all deposit accounts, and any residual interest in the collateral securing the bonds for

decommissioning obligations (such bonds are pledged to third parties).

**C.     Unsecured Note**

17.     In June 2015, Whistler issued a Subordinated Promissory Note to Freepoint Commodities LLC ("Freepoint") in the initial amount of $15,000,000 ("Subordinated Note"). The Subordinated Note was amended two times (once in August 2015 to increase the amount to $30,000,000 and a second time in November 2015 to increase the total amount to $31,500,000). The Subordinated Note was subject to that certain Subordination Agreement between Whistler, The Bank of New York Mellon, as administrative agent to the Apollo Holders, and Freepoint. The Subordinated Note is referred to as the "Junior Note" and the funds provided to Whistler were loaned on an unsecured basis.  As of today, Whistler's liability under the Subordinated Note is $31,500,000 plus interest and costs.

**D.     Membership Interests**

18.     The equity in the Debtor is held in the form of Membership Interests issued pursuant to the 2013 LLC Agreement.

19.     Commerce Oil holds 100% of the Preferred Units of Membership Interest and over 38% of Common Units.  Commerce Oil LLC is also the Supermajority Unitholder under the terms of the 2013 LLC Agreement.  Whistler, as such, must seek the consent or approval of Commerce Oil LLC prior to taking certain actions, which are enumerated in the 2013 LLC Agreement.  The remaining Common Units are held by Frankel Green Canyon LLC, Black Star Energy LLC, Englehart Energy, Inc., Curtis Carver, Bethancourt Oil & Gas Company, and Ken Reed in both vested and unvested units.  The Apollo Holders as well as Summit Partners Credit Fund, L.P. and certain affiliates[1] hold vested warrants.

---

[1] The Summit Partners include Summit Investors I, LLC, Summit Investors I (UK), L.P., Summit Partners Credit Fund A-1, L.P. and Summit Partners Credit Offshore Intermediate Fund, L.P.

5

### E. Other Significant Obligations

20. To maintain its oil and gas leases, Whistler must, generally, either be conducting operations or paying royalties on production to the federal government ("Lessor Royalties"). Whistler pays monthly royalties to the federal government and remits such payments to the United States, through the Department of the Interior, Office of Natural Resources Revenue. Whistler is current in such obligations.

21. In addition to these Lessor Royalties, the Debtor's properties are burdened by certain overriding royalty interests (ORRIs) in favor of Fisherman's Petroleum and the Debtor's immediate predecessors in title, namely Mobil Oil Exploration & Producing Southeast Inc. and W&T Offshore, Inc. As of this filing, Whistler is current in such obligations. However, Fisherman's Petroleum may not have cashed all of its royalty checks.

## II. REQUEST FOR EMERGENCY HEARINGS ON FIRST DAY MOTIONS

22. As set forth above, the Debtor is operating in a cash-intensive industry and is struggling to meet its day-to-day liquidity needs in order to derive the maximum revenue from existing and future production. The Debtor intends to seek entry of Court orders approving each of the First Day Pleadings as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Local Rules. Absent the Court granting the relief requested by the Debtor in its First Day Pleadings on an emergency basis, the Debtor will suffer immediate and irreparable harm.

23. I have reviewed the First Day Pleadings listed below and the allegations contained in each are true and correct to the best of my knowledge.

### A. Administrative and Procedural Matters

      *i. Emergency Motion Seeking Extension of Time to File Scheduled of Assets and Liabilities, Current Income and Expenditures, Executory*

*Contracts and Unexpired Leases, and Statements of Financial Affairs (the "Schedules and Statements Motion")*

24. The Debtor's management and employees, together with the Debtor's outside legal and financial advisors, have begun compiling the information necessary to complete the Schedules and Statements. Since I was hired as CRO on May 10, 2016, I have been in place for about two weeks. In addition, the Debtor has limited staffing, and such staffing has been working to prepare cash flow forecasts and budgets, creditors' lists and other material in response to the involuntary petition. Consequently, the Debtor has not had a sufficient opportunity to complete the preparation of the Schedules and Statements.

25. Additionally, the Debtor is still an operating business and has ongoing responsibilities for such business. Accordingly, I do not anticipate the Debtor will be capable of finalizing its Schedules and Statements within deadline prescribed by the Bankruptcy Rules.

26. Granting the Debtor additional time to collect the data needed to prepare and file the Schedules and Statements will greatly enhance their accuracy, while allowing the Debtor to simultaneously focus its attention on other high priority matters in the early stages of this case. I anticipate that it will take the Debtor management and employees, with the assistance of their legal and professional advisors, approximately 45 additional days beyond the period contemplated by Bankruptcy Rule 1007(c) to complete, review, and file the Schedules and Statements with the Court.

27. For the foregoing reasons, I believe that it is in the best interests of the Debtor, its estate and creditors, and all other parties in interest that the Court grant the relief requested in the Schedules and Statements Motion.

**B.** **Substantive Matters**

     *i.* *Emergency Motion: (i) to Obtain Debtor-in-Possession Financing on an Interim and Final Basis; (ii) for Approval of Interim and Final Use of*

8717797v.3

*Cash Collateral and Granting Adequate Protection and (the "<u>DIP Financing / Cash Collateral Motion</u>")*

28. The Debtor has an immediate need for the use of Cash Collateral in order to, among other things, preserve and maintain the value of their assets and business. Further, an immediate and critical need exists for the Debtor to use Cash Collateral, consistent with the Budget, for working capital purposes, general corporate purposes, and the satisfaction of costs and expenses of administering the Case. The Debtor is without sufficient funds, other than Cash Collateral, to operate until the Final Hearing can be held. Further, the Debtor is unable to obtain adequate unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense.

29. Access to cash collateral is critical for the Debtor to proceed through chapter 11. Absent the ability to use Cash Collateral, the Debtor will be forced to shut down its operations abruptly, which the Debtor believes will negatively impact the value of their assets. For the foregoing reasons, I believe that it is in the best interests of the Debtor, its estate and creditors, and all other parties in interest that the Court grant the relief requested in the Cash Collateral Motion.

30. The Debtor also has an immediate need for debtor-in-possession financing. The Debtor reached out to nine institutional and private funds who provide debtor-in-possession financing in the energy space. The Debtor informed such funds that the first lienholder was Apollo, and that there likely would be a priming fight if such fund were willing to lend new monies to the Debtor. Eight of the funds indicated that they were not interested in providing such financing under such circumstances, and one fund failed to respond. Accordingly, the Debtor was unable to find an alternative debtor-in-possession lender to the Apollo Holders. The Apollo Holders have indicated that the Apollo Holders are willing to provide debtor-in-

8

possession financing to the Debtor in the amount of $15,000,000 ("DIP Financing Loan").

31. The Apollo Holders have requested that the Debtor agree to the following terms for the DIP Financing Loan, including obtaining a superpriority administrative claim against the Debtor and a superpriority prior senior lien against all the assets of the Debtor, including the postpetition assets and avoidance actions. Effectively, the Apollo Holders seek to effectively prime their own prepetition liens. Since the total value of the Debtor's assets is roughly equivalent to or slightly less than the prepetition debt owed to the Apollo Holders, there is no value available to junior lienholders. Accordingly, it is not necessary to provide adequate protection to anyone other than the Apollo Holders.

32. The Debtor has informed the Apollo Holders that there should be an investigation period in the DIP Financing Loan for any committee formed in this Bankruptcy Case. The Apollo Holders have agreed to set aside a period of time for such investigation. The Debtor also disagreed that the Apollo Holders should obtain liens against the avoidance actions. However, the Debtor was unable to get the Apollo Holders to remove that lien requirement.

33. For the foregoing reasons, I believe that it is in the best interests of the Debtor, its estate and creditors, and all other parties in interest that the Court grant the relief requested in the DIP Financing / Cash Collateral Motion.

> ii. *Emergency Motion for Approval of Interim and Final Orders (I) Authorizing Debtor to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Maintain Employee Benefit Programs, and (II) Directing Financial Institutions to Receive, Process, Honor and Pay All Checks Presented for Payment and to Honor All Fund Transfer Requests Related Thereto  (the "Wages Motion")*

34. The Debtor currently employs approximately eight (8) full-time employees, each of which receives a salary. The Debtor's employees are paid semi-monthly on the fifteenth and thirtieth day of each month. The Debtor's average semi-monthly payroll totals approximately

$59,000.

35. The Debtor uses Automatic Data Processing, LLC ("ADP") to process and pay employee compensation. As part of the Debtor's ordinary course of business, the funds to pay employee wages are withdrawn from the Debtor's bank account two (2) days prior to each payroll date and are sent to ADP. ADP holds those funds until payroll is released the next business day, and transfers as required withholding payments to the Internal Revenue Service. The Debtor pays approximately $350 per month to ADP for the payroll services it provides to the Debtor. As of the Petition Date, the Debtor owes approximately $162 on account of Payroll Fees. It is critically important that the Debtor be able to continue to compensate the Debtor's employees on the historical payroll schedule, and this requires the services of ADP.

36. As of the Petition Date to May 6, 2016, the Debtor employed nine (9) full-time employees. As of the Petition Date, the Debtor had a payroll due on March 31, 2016 in the amount of $72,000 for those nine employees, including accrued and unpaid wages earned prior to the Petition Date. The Debtor paid its employees for this period on March 31, 2016.

37. None of the amounts owed to Debtor's employees during the prepetition period exceeded the statutory cap.

38. During the Gap Period, the Debtor has paid its employees for wages earned and accrued in the ordinary course of business.

39. As of May 24, 2016, the Debtor's next pay period is May 31, 2016, and it covers the period May 16, 2016 through May 31, 2016. In order to ensure that ADP is in receipt of the funds necessary to fund the May 31, 2016 payroll, the Debtor must transfer the funds to ADP on May 27, 2016 in the amount of $59,000.

40. In the ordinary course of business, the Debtor makes various benefit plans

available to its employees, including: (a) paid time off, including holidays, vacation days, and jury duty leave; (b) medical, dental, and prescription drug benefits; (c) severance benefits; and (d) miscellaneous benefits.

41. Employees accrue paid time off and related benefits. These include vacation days and holidays. Employees accrue vacation days throughout the year, with the number of vacation days based upon an employee's years of industry experience or in accordance with their employment agreements. Employees may use vacation days at their discretion. Employees may carry over 40 hours of vacation to the next year. In the event an employees is terminated other than for cause, it has been the Debtor's practice to pay the employee for accrued but unused vacation days at the employee's base compensation rate, or as required by law.

42. The Debtor recognizes 10 holidays as a paid time-off benefit for its employees. Employees are not entitled to cash payments for holidays. Thus, the Debtor does not believe there are any obligations owing as of the Petition Date on account of holidays.

43. The Debtor provides medical, dental, and prescription drug plans, and workers' compensation benefits. Seven (7) employees are covered under the Debtor's medical and prescription drug plans, which are administered by Blue Cross Blue Shield. Eight (8) employees are covered under the Debtor's dental plan, which is administered by Humana. Both the medical plan and the dental plan are self-insured and require the Debtor to pay all costs arising under such plans, aside from employee contribution deductions, including claims payments and associated administrative costs.

44. The Debtor provides workers' compensation insurance for its employees as required by applicable law. The Debtor does not believe it owes any prepetition amounts on account of the administration fees under this program. The Debtor also does not believe that it

currently has any workers' compensation claims outstanding.

45. The Debtor also provides eligible employees with certain additional benefits, including employee parking. The Debtor pays these expenses as they arise in the ordinary course of business.

46. In the ordinary course of business, the Debtor reimburses employees for certain expenses, including, airfare, car rental, lodging, cellular telephones, and meal expenses, incurred in performing their employment duties, government application fees, and internet fees. The majority of reimbursable expenses are paid directly by the employees. The Debtor pays approximately $4,000 per month on account of reimbursable expenses. Based on historical practice, the Debtor estimates roughly that, as of the Petition Date, employees were owed approximately $4,000, or roughly one month of unpaid reimbursable expenses (including reimbursable expenses for which employees have not yet requested reimbursement). Employees have incurred reimbursable expenses as business expenses on the Debtor's behalf and with the understanding that the Debtor would reimburse them.

47. For the foregoing reasons, I believe that it is in the best interests of the Debtor, its estate and creditors, and all other parties in interest that the Court grant the relief requested in the Wages Motion.

### iii. Emergency Motion for Interim and Final Orders Providing Adequate Assurance of Utility Payments (the "<u>Utility Motion</u>")

48. <u>Utility Services</u>. The Debtor has two utility providers: (i) Logix Communications for phone services; and (2) Cogent Communications for internet services. These services are necessary for the continued operation of the Debtor's day-to-day affairs. Uninterrupted utility service is critical to the Debtor business operations, and the loss of utility service would substantially disrupt the Debtor operations and result in revenue loss, which could

8717797v.3

irreparably harm and jeopardize the Debtor operations and strategic objectives of all parties of interest.

49. I believe that the proposed Adequate Assurance Deposits listed on **Exhibit A** to the Utility Motion, which are calculated based on one-half of the approximation of one month's worth of utility service as calculated by the Debtor according to the last historical three-month period, are sufficient adequate assurance of the Debtor future payments to the Utility providers.

50. For the foregoing reasons, I believe that it is in the best interests of the Debtor, its estate and creditors, and all other parties in interest that the Court grant the relief requested in the Utility Motion.

> iv. *Emergency Motion to (i) Approve Maintenance of Certain PrePetition Bank Accounts and Cash Management System and (ii) Continue Use of Existing Checks and Business Forms (the "Cash Management Motion")*

51. Bank Accounts. Historically, the Debtor has maintained four (4) bank accounts at various banks and financial institutions. A complete list of the Debtor bank accounts may be found at **Exhibit A** to the Cash Management System.

52. The Debtor maintains four bank accounts with JPMorgan Chase Bank and Cadence Bank: (i) Account No. XXXXX9572 with JPMorgan Chase Bank (the "Whistler Operating Account"), (ii) Account No. XXXXX7683 JPMorgan Chase Bank (the "Whistler Capital Expenditures Account"), (iv) Account No. XXXXX7706 (the "Whistler Interest Reserve Account") and (iii) Account No. XXXX6127 (the "Whistler Checking Account") with Cadence Bank.

53. The funds received by the Debtor are transferred or deposited into the Whistler Operating Account on a daily basis, this includes all cash receipts, including revenues, reimbursements and refunds. The Whistler Checking Account receives transfers from the Whistler Operating Account and disburses all payments, royalties and payroll related

13

8717797v.3

disbursements. The Debtor maintains spreadsheets with daily cash activity and reviews and provides instructions to the back office service provider for cash management from the Whistler Checking Account.

54. The Whistler Operating Account receives the Debtor's revenues from its crude oil and gas sales. To the extent that Whistler receives any other deposits, i.e., refunds, such deposits are made to the Whistler Operating Account. The Whistler Operating Account also has a deposit control agreement as required under the Note Purchase Agreement.

55. The Whistler Capital Expenditures Account is used for the Debtor's cap ex program. On the Petition Date, there was approximately $4,309 in this account. As of May 23, 2016, the current balance is $0.00.

56. The Whistler Interest Reserve Account was set up in accordance with the Note Purchase Agreement. The current balance for this account is approximately $195.

57. Whistler plans to consolidate its bank accounts in a manner consistent with United States Trustee reporting guidelines and loan agreements.

58. Business Forms. Prior to the involuntary petition commenced against the Debtor, in the ordinary course of business, the Debtor used numerous business forms, including, but not limited to, letterhead, purchase orders, invoices, contracts, wires and checks. The Debtor issues computer-generated checks from their Checking Account only that can be modified electronically, at no additional cost to the Debtor estates, to include the "debtor in possession" language and the case number assigned to this case. Wires from the J P Morgan Chase accounts are authorized by two management members to transfer funds to the Checking Account to provide funds for payment of checks out of the Checking Account.

59. Bank Fees. In the ordinary course of business, the Debtor banks debit the Debtor

bank accounts for a number of fees and expenses related to the cost of administering such bank accounts, including, *inter alia*, wire transfers and other fees, costs, and expenses standard for a typical corporate bank account (collectively, the "Bank Fees"). The Bank Fees are debited directly from the Debtor bank accounts on a monthly basis to cover the banks cost of services. The Bank Fees are a normal cost of doing business and, without authority to pay such Bank Fees, the Cash Management System would be significantly impaired. Accordingly, I believe the Debtor should be authorized to continue paying the Bank Fees in the ordinary course of business

60. For the foregoing reasons, I believe that it is in the best interests of the Debtor, its estate and creditors, and all other parties in interest that the Court grant the relief requested in the Cash Management Motion.

> **v. Emergency Motion for Order Authorizing Debtor to Continue Insurance Policies (the "Insurance Motion")**

61. Insurance Broker and Agent. The Debtor employs McGriff Seibels & Williams of Texas Inc. as its insurance broker and agent. The Debtor pays a fee to find and sell the Insurance Policies to the Debtor. McGriff Seibels & Williams of Texas Inc. also advises the Debtor on the appropriate policies for the Debtor businesses.

62. All premiums due or payable have been paid to the Broker or have been prepaid for the policy year ended in July 2016.

63. Insurance Policies. In the ordinary course of business, the Debtor maintains certain Insurance Policies covering, *inter alia*, general liability, automobile liability, workers compensation, physical damage to oil and gas property and equipment, drilling and well control, director and officer, employment practices, and fiduciary liability. The Insurance Policies are essential to the Debtor ongoing operations.

15

64. The success of the Debtor efforts to operate in chapter 11 will depend on the maintenance of the Insurance Policies on an uninterrupted basis. The Debtor's failure to pay the Insurance Claims, as and when they become due, could affect their ability to renew the Insurance Policies, which could have a material adverse effect on the Debtor operations. If the Insurance Policies are allowed to lapse or are terminated, or if the Debtor defaults under the Insurance Policies based on their non-payment of Insurance Claims, the Debtor could be exposed to substantial liability for damages resulting to persons and property of the Debtor and others. This exposure would negatively impact the Debtor's ability to operate effectively and efficiently without disruption in chapter 11. Additionally, to ensure the retention of qualified and dedicated senior management, the Debtor must continue the directors' and officers' liability policies. Accordingly, I believe that the Debtor should be authorized to maintain the Insurance Policies and pay the Insurance Claims as well as to revise, extend, supplement, or change insurance coverage, as necessary, in the ordinary course of business.

65. For the foregoing reasons, I believe that it is in the best interests of the Debtor, its estate and creditors, and all other parties in interest that the Court grant the relief requested in the Insurance Motion.

### *vi. Emergency Motion for Authority to Pay Royalty and Working Interest Obligations (the "Royalty Motion")*

66. <u>Oil and Gas Leases and Operations.</u> The Debtor's operations are focused on the exploration, development, and production of oil and gas. As such, to maintain its oil and gas leases, it must, generally, either be conducting maintenance operations or paying royalties on production to the federal government ("**Lessor Royalties**").

67. <u>Lessor Royalties and ORRIs.</u> In connection with its oil and gas assets, the Debtor is obligated, pursuant to the oil and gas leases and other agreements, to remit to the United

16

States, through the Department of the Interior, Office of Natural Resources Revenue, the following Lessor Royalties on production:

| Lease | Lessor Royalty |
|---|---|
| Lease OCS-G 34961, GC 19 | 18.75000% |
| Lease OCS-G 05809, EW 944/988 | 16.66667% |
| Lease OCS-G 14021, GC 60 | 16.66667% |
| Lease OCS-G 04940, CG 18 | 16.66667% |

68. In addition to these Lessor Royalties, the Debtor's properties are burdened by certain overriding royalty interests (ORRIs) in favor of Fisherman's Petroleum and the Debtor's immediate predecessors in title, namely Mobil Oil Exploration & Producing Southeast Inc. and W&T Offshore, Inc. These ORRIs are in various percentages depending on the depths and aliquots associated with the Debtor's leasehold interests, and are also further impacted by whether the producing wells were drilled when the acquisitions occurred or were drilled thereafter. Failure to pay the Lessor Royalties and ORRIs may have a material adverse effect upon the Debtor and its operations, including, without limitation, potential cancellation, forfeiture, or termination of oil and gas leases, penalties and interest, turnover actions, conversion claims, significant lien claims, constructive trust claims, litigation, and, in some instances, removal as operator.

69. For the foregoing reasons, I believe that it is in the best interests of the Debtor, its estate and creditors, and all other parties in interest that the Court grant the relief requested in the Royalty Motion.

8717797v.3

### III. CONCLUSION

70. The Debtor's immediate objective is to continue to operate its businesses with as little interruption or disruption as possible to minimize any loss of value during the pendency of this case. I believe that if the Court grants the relief requested in the First Day Pleadings, the prospect for achieving these objectives will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed: May 23, 2016.

*/s/ Richard DiMichele*
Richard DiMichele
Chief Restructuring Officer
Whistler Energy II, LLC