UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISIONS

| | |
|---|---|
| IN RE: § § WHISTLER ENERGY II, LLC, § § DEBTOR. § | CASE NO. 16-10661 CHAPTER 11 |

DECLARATION OF ROBERT E. WICHERT
IN SUPPORT OF FIRST DAY PLEADINGS

I, Robert E. Wichert, declare the following to be true and accurate under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am over the age of 18 and am otherwise fully competent to make this declaration ("Declaration").

2. From 2012 to 2016, I served as Executive Vice President and Chief Operating Officer of Whistler Energy II, LLC ("Whistler" or the "Debtor"). In this capacity, I had responsibility for day-to-day drilling and production operations for Whistler.

3. In May 2016, I also took on added responsibilities, and was appointed as the Acting Interim President and Chief Executive Officer for Whistler. In such capacity, I am generally familiar with the Debtor's business and day-to-day operations.

4. I have over thirty (30) years of engineering and operations management in the oil and gas industry, including drilling, completions, facilities, production and transmission. I have also worked in the Gulf of Mexico for over twenty-five (25) years on various projects.

5. I submit this Declaration in support of the consent by the Debtor to the order for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the motions and applications for related relief filed as of May 23, 2016 or concurrently herewith (collectively, the "First Day Pleadings").

8663427v.3

6. I have reviewed the First Day Pleadings and, to the best of my knowledge, formed after reasonable inquiry, I believe that approval of the relief requested therein is necessary to minimize disruption to the Debtor business operations. I also believe that absent immediate relief to allow the Debtor to continue conducting its operations in the ordinary course of business as set forth herein, and described in greater detail in the First Day Pleadings, the Debtor would suffer immediate and irreparable harm to the detriment of its estate.

7. All the facts and opinions set forth in this Declaration are based upon my experience, knowledge, and information concerning the Debtor operations, business affairs, my review of relevant documents, information provided to me or verified by other executives or employees, conversations with other members of the Debtor management, and my experience and knowledge in the oil and gas industry generally. If called to testify, I would testify to the facts and opinions set forth herein based upon my personal knowledge, my review of relevant documents, and my investigation as Acting Interim President and Chief Executive Officer as well as my investigation as Chief Operating Officer. I am authorized to submit this declaration on behalf of the Debtor.

8. Part I of this Declaration provides an overview of the Debtor business operations. Part II of this Declaration provides an overview of the oil and gas operations. Part III provides an overview of the circumstances surrounding the commencement of the above-captioned case (the "Case"). Part IV of this Declaration sets forth the facts relevant to the First Day Pleadings and the Debtor's business judgment in seeking such relief. Part V of this Declaration sets forth my bases for concluding that the relief requested in the First Day Pleadings is in the best interests of the Debtor, its estate and creditors, and all parties in interest.

## I. OVERVIEW

### A. Business Overview

9. Whistler, a Delaware limited liability company, is engaged in the acquisition, exploration, development, and production of oil and natural gas properties located in offshore Gulf of Mexico ("GOM"). Whistler is headquartered in Houston, Texas, with eight full-time employees. Whistler utilizes third party providers for additional in-office and back office support. Whistler also engages third party providers to provide skilled and trained personnel in support of shorebase and offshore production operations.

10. Whistler holds an interest in four oil and gas leases (as more fully described below) on the outer continental shelf ("OCS") in the Gulf of Mexico. Whistler has both production operations and drilling operations on Platform "A" located in the Green Canyon block of the GOM.

11. Whistler currently produces 2,500 barrels per day, which provides net revenue of $2,000,000 per month.

12. For its production operations, Whistler uses a major service provider to provide day-to-day management over production operations. For major repair and construction work, Whistler uses a project management company for such work. Whistler also employs other service providers to assist Whistler in meeting its health, safety, and environmental obligations under applicable law.

13. Whistler sells its crude oil production to Freepoint Commodities Trading and Marketing LLC. Title and risk of loss occur at the manifold connection of the interconnecting pipeline at the platform. The contract is an evergreen contract, and renews at the beginning of each delivery month.

14. Whistler sells its gas production to Cima Energy Ltd. ("Cima Energy") (successor-in-interest to Texon L.P.). Title and risk of loss occur at the manifold connection of the interconnecting pipeline at the platform. As part of the agreement, Cima Energy also agrees to make pipeline and plant nominations on behalf of Whistler. The contract with Cima Energy is a three year contract, which terminates on August 31, 2016.

15. Whistler is in the middle of a drilling campaign. In November 2015, it completed drilling operations on its A5 well. Such operations were successful, and the A5 well added additional barrels to its production. From November 2015, until March 10, 2016, Whistler was in the midst of drilling operations on its A13 well ("Erato Well") when the drilling operations were suspended and the Bureau of Safety and Environmental Enforcement ("BSEE") ordered a shut in (as more fully described below).

16. As of May 2016, drilling operations continue to be suspended on the Erato Well.

**B. History of Whistler**

17. Whistler was founded by Mr. Scott Frankel in 2012 for the purpose of acquiring Gulf of Mexico producing properties. In 2013, Mr. Frankel conveyed his membership interest in Whistler to Frankel Green Canyon LLC. That same year, Frankel Green Canyon LLC ("Frankel Green"), Black Star Energy LLC ("Black Star"), Curtis Carver ("Carver"), Englehart Energy, Inc. ("Englehart Energy"), Bethancourt Oil and Gas Company ("Bethancourt Oil"), and Commerce Oil LLC ("Commerce") entered into an Amended and Restated Limited Liability Company Agreement ("2013 LLC Agreement"). As part of the 2013 LLC Agreement, Commerce, a subsidiary of Freepoint Commodities, LLC ("Freepoint"), became the supermajority member. The initial Board of Managers included Mr. Scott Frankel, who also served as President and Chief Executive Office, Robert Wichert, who was appointed as Chief

Operating Officer and Executive Vice President, and a Commerce Oil representative for the Board.

18.    In July 2013, Whistler acquired 100% of the working interests in the Lease OCS-G 04940, Green Canyon Block 18 ("GC 18") and Lease OCS-G 14021, Green Canyon Block 60 ("GC 60") as well as a portion of Lease OCS-G 05809, Ewing Banks Blocks 944/988 ("EW 944/988") from Mobil Oil Exploration & Producing Southeast Inc. ("ExxonMobil") and W&T Offshore, Inc. ("W&T").  In the same purchase agreements, Whistler acquired options to purchase the remaining portion of the EW 944/988, which Whistler did acquire.  In addition, W&T assigned a 45% interest in the Lease OCS-G 34961, Green Canyon Block 19 ("GC 19") to Whistler.

19.    In the fall of 2013, Whistler undertook a major refurbishment and upgrade to GC 18 platform, which including major system overhaul and structural upgrades.  Whistler also made changes to the platform to support drilling rig operations and add additional quarters for drilling crews.  The upgrade was completed in the second quarter of 2015.

C.    **Current Management**

20.    On May 6, 2016, Mr. Scott Frankel was separated from the Debtor. The Board of Managers appointed Mr. Robert Wichert, who is the Chief Operating Officer, to also serve as Interim President and Chief Executive Officer.

21.    In May 2016, Whistler engaged the services of TDF Partners LLC ("TDF") to provide restructuring advice.  Mr. Rich DiMichelle of TDF was appointed as the Chief Restructuring Officer.

## II. OIL AND GAS OPERATIONS

### A. Oil and Gas Leases

22. GC 18 has a fixed production platform located in approximately 750 feet of water and approximately 150 miles offshore Louisiana. There are ten producing wells located in GC 18 through which the Debtor's production flows and is initially processed and sold at the platform.

23. GC 60 is located about 150 miles south of New Orleans, offshore Louisiana. The Debtor has a subsea producing well (Well No. 2), with a subsea tieback to the production platform in GC 18. The production from the GC 60 well flows through the GC 18 production platform and is initially processed and sold at the platform.

24. In EW 944/988, the Debtor has a producing well (Well No. 29).

25. In GC 19, an exploration plan has been filed, but there is no planned development for this lease at this time. Any prospective drilling on GC 19 can be completed from GC 18.

26. During the first quarter of 2014, Whistler conducted certain activities that did not require the use of a drilling rig. These activities included recompleting two wells; stimulating two other wells; adding gas lift for three wells, and repairing a well. These actions increased production.

27. As of December 2015, the Debtor had estimated net proved reserves of approximately 11.0 MMBoe, comprised of 9.3 Bcf of natural gas and 9.4 MMBbls of oil and condensate with a total net present value discounted at 10% (PV10) of $92 million (inclusive of asset retirement obligations).

28. If the Erato Well is successful, the Debtor estimates that production will be increased by 5000 barrels per day.

8663427v.3

**B. Performance Bonds**

29. Whistler is required to post certain bonds as per the Department of Interior, Bureau of Ocean Energy Management ("BOEM") requirements. Whistler also is required to have certain bonds as per the requirements under the acquisition documents with ExxonMobil and W&T. The Debtor presently has a combination of bonds for BOEM, Exxon, and W&T in the amount of $78,799,999, all underwritten by Argonaut Insurance Company ("Argo Surety").

30. In 2015, BOEM required Whistler to post bonds for five (5) rights-of-way. Whistler posted bonds for all five (5) rights-of-way, but BOEM agreed to accept bonds for less than the total assessments for three (3) of the rights-of-way. Recently, BOEM has made demand on Whistler to post the incremental amounts for these three (3) under-secured rights-of-way so that the bonds posted equal the BSEE assessments for these three (3) rights-of-way. This incremental bonding requirement totals $1,859,000 and is due June 3, 2016. In addition, a premium is due to Argo Surety in July for approximately $936,000.

**III. EVENTS LEADING TO CHAPTER 11**

**A. Erato Well - Funding Issues**

31. Under the Note Purchase Agreement, Whistler agreed that the proceeds would be used in furtherance of the approved plan of development ("APOD"). Though there was an initial APOD attached as part of the Note Purchase Agreement, Whistler had the right to submit and seek approval for an updated APOD. The last updated APOD was approved in December 2014. As per the December APOD, the first two wells to be drilled by Whistler were the A5 well and the Erato Well.

32. Under the 2013 LLC Agreement, Commerce had obligations to make capital contributions to Whistler in the event of funding deficits for such wells. There is a dispute

regarding whether Whistler met the terms and conditions under the 2013 LLC Agreement, which would have required Commerce to make a capital contribution for the Erato Well.

**B.   2015 Restructuring Transaction**

33.   In late 2015, Whistler engaged with various parties to restructure Whistler's debt and equity structure ("Restructuring Transaction"). As a result of such discussions, the parties entered into several agreements and documents to effectuate the Restructuring Transaction. Whistler agreed to issue new secured Tranche B Notes in the aggregate amount of $20,000,000. The proceeds from the New Notes were to support drilling operations for the completion of the Erato Well.

34.   As of December 30, 2015, all of the documentation for the Restructuring Transaction had been signed and signatures were delivered into escrow. At some point that same day, the signatures to the Restructuring Transaction were released. Several hours later, the same day that the platform was shut in as described below, the signatures released from escrow were recalled. Whistler expected to receive a cash sum of $19,308,170.50, net of original issue discount, for the New Notes and a cash sum of $291,829.50 for a portion of the Class A Units of membership interest. However, there is a dispute regarding whether the Restructuring Transaction ever closed.

**C.   Shut In Due to Sheen**

35.   Throughout the fall of 2015, Whistler had been notified of a recurring sheen near the platform. However, the source of the sheen was not determined. On December 30, 2015, Whistler was contacted by representatives of BSEE that Whistler's platform was being shut in, immediately, due to the BSEE's observation of a recurring "sheen" on the surface of the Gulf of Mexico waters in the vicinity of the platform. Whistler was informed that the shut in would last

8

until Whistler could determine and rectify the source and cause of the sheen. After Whistler investigated the source of the sheen, and determined that it was not coming from the platform, BSEE lifted the shut in order for the platform during the first week in January 2016.

**D.    Drilling Operations Suspended**

36.    Whistler and Nabors Drilling Corporation ("Nabors") entered into a drilling contract for the use of Rig MODS 21 ("Drilling Rig").

37.    On March 10, 2016, there was a fatality on the Nabors Drilling Rig that was drilling from GC 18 platform. The incident was immediately reported to the BSEE, which promptly formed an investigative panel to investigate the incident and ensure preservation of evidence on the rig. The incident resulted in a complete shutdown of drilling operations at the facility and a temporary cessation of all production operations on the platform. BSEE formalized this shutdown by issuing a "facility shut-in" Notification of Incident(s) of Non-Compliance on March 25, 2016.

38.    BSEE's order did not affect nor suspend production operations on the platform.

39.    Subsequently, Whistler notified Nabors that a force majeure event had occurred on March 11, 2016 as per the terms of the contract.

40.    Beginning around March 21, 2016, Whistler and Nabors, with BSEE input and approval, initiated protocols for the removal and transport of rig equipment and subsequent storage at a Nabors yard in New Iberia, Louisiana. On March 23, 2016, management teams from Whistler and Nabors met at the BSEE regional office in New Orleans to discuss recommencement of operations.

41.    Following the meeting, Whistler submitted a "Performance Improvement Plan" to BSEE on March 30, 2016 and formally requested that BSEE allow operations to be resumed. In

a letter dated April 14, 2016, BSEE notified Whistler that it was required to include additional items in a revised Performance Improvement Plan to be jointly submitted by Whistler and Nabors. Whistler management then met again with Nabors and BSEE on May 17, 2016 to present a revised plan. BSEE has also requested that Whistler and Nabors produce documents regarding the incident. Whistler is in the process of gathering responsive documents and will be responding to BSEE's requests on May 31, 2016

42. The incident also resulted in a lawsuit being filed by certain family members of the decedent. The lawsuit was filed on March 18, 2016 in Louisiana state court and subsequently removed to the United States District Court for the Eastern District of Louisiana. The lawsuit has been stayed as a result of the bankruptcy and no further activity has occurred. Under the terms of its drilling contract with Nabors, Whistler has made a demand on Nabors for defense and indemnity for the claims in the lawsuit. Nabors has not yet responded.

**E.  History of Hedges**

43. Whistler used to hedge no more than 80% of its production. However, Whistler terminated its hedges, making more than $18,000,000 available for operations.

44. As of this filing, Whistler has no open hedge positions.

**F.  Involuntary Petition Filed Against Whistler**

45. On March 24, 2016, five petitioning creditors filed an involuntary petition under chapter 11 of the United States Bankruptcy Code against Whistler. On April 18, 2016, Whistler filed an answer to the involuntary petition, and an order for relief was entered on May 23, 2016.

**G.  Pipeline Maintenance Suspends Production**

46. As explained above, Whistler sells its oil production and gas production at the platform. The production leaves the platform through two pipelines. The gas production is

transported via a pipeline owned and maintained by Manta Ray Offshore Gathering Company, LLC ("Manta Ray"). On March 1, 2016, an Enbridge pipeline downstream of the Manta Ray line was shut in due to routine maintenance. This routine maintenance lasted about three weeks. During this period, Whistler was able to continue its crude oil production. However, Whistler did not have any gas sales.

47. The crude oil production is transported via a pipeline owned and maintained by Shell Pipeline ("Shell"). On March 26, 2016, the Shell pipeline was shut-in for routine maintenance. This shut-in placed crude oil production sales on hold. Shell's pipeline maintenance lasted over three weeks, which reduced Whistler's monthly revenues. On April 21, 2016, production operations were resumed.

**H.   Drilling Remains Suspended**

48. As indicated above, on May 17, 2016, Whistler met with BSEE to determine the timetable to re-commence drilling operations. At such meeting, Whistler indicated that it was going to place a temporary plug in the Erato Well. Whistler intends to recommence drilling operations to place the temporary plug once BSEE lifts the suspension order. Whistler's longer term goal is to finish drilling operations on the Erato Well to target depth and to drill additional wells once a plan has been confirmed and permanent financing obtained.

**IV.   REQUEST FOR EMERGENCY HEARINGS ON FIRST DAY MOTIONS**

49. The Debtor intends to seek entry of Court orders approving each of the First Day Pleadings as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Local Rules. Absent the Court granting the relief requested by the Debtor in its First Day Pleadings on an emergency basis, the Debtor will suffer immediate and irreparable harm.

50. I have reviewed the following First Day Pleading listed below and the allegations contained in each are true and correct to the best of my knowledge.

> **i. Emergency Motion for Authority to Pay or Honor Prepetition Obligations to Certain Critical Vendors ("Critical Vendor Motion")**

51. On average, the Debtor uses about sixty (60) service providers and goods vendors in the ordinary course of its business. The Debtor undertook a review of all its service providers and goods vendors to determine which were critical to its operations, which were impractical to replace, and which had indicated that they would stop providing services or goods to the Debtor unless such service providers/good vendors were paid outstanding amounts owed to them.

52. After its review, the Debtor identified three categories of critical vendors that are essential to maintain operations. The first category of critical vendors involves staffing contractors ("Staffing Contractors") that: (a) provide day-to-day management personnel for production operations as well as provide skilled personnel for such operations; (b) provide highly skilled personnel to serve in the capacity of the Debtor's representative for certain types of drilling and production operations; (c) provide project management for major repairs involving the GC 18 platform; (d) assist the Debtor in meeting its regulatory obligations, including reporting requirements under applicable federal law (*e.g.*, compliance with BSEE's safety and environmental management systems (aka SEMS); and (e) provide highly trained personnel to assist the Debtor in meeting health, safety, and environmental ("HSE") requirements. The second category of critical vendor involves the service provider that provides the software, which holds historical data and enables the Debtor to meet its reporting requirements for SEMS ("Critical Software Vendor"). The third category of critical vendor involves a goods provider ("Goods Provider") that supplies the chemicals necessary for production operations.

53. The Staffing Contractors provide highly skilled and technical personnel to the

8663427v.3

Debtor for its operations. In addition, these Staffing Contractors and their personnel have legacy knowledge of the GC 18 Platform. This legacy knowledge is important, allowing the Staffing Contractors to troubleshoot any potential issues on the platform in a cost effective manner.

54. In addition, it is impractical to switch to new or alternative Staffing Contractors at this point. For the day-to-day management, this would require a transition period, which would require the new Staffing Contractor to shadow the current Staffing Contractor for a few months. This would add additional costs. For project management, any new project manager would need to familiarize itself with the operations, which again would cost money, but more importantly would cause excessive delays in the Debtor's operations. In the end, there likely would be minimal or no cost savings to the Debtor and the Debtor would lose the advantage of Staffing Contractors who have worked these assets for years. Most of the Staffing Contractors have threatened to stop working if such were not paid the prepetition amounts owed to them.

55. The Critical Software Vendor provides a product that is integral to the operations of the Debtor. Again, to replace this vendor could cause downtime in operations, especially if the Debtor was unable to meet its government reporting requirements in a timely manner.

56. The Goods Provider supplies the specific chemicals necessary for production. To find a replacement chemical supplier is impractical because it would take about two to three months for the replacement supplier to analyze the chemicals needs of the platform. In addition, the Debtor orders the chemicals on an as needed basis. The Goods Provider is under no obligation to fill the Debtor's order.

57. The Staffing Contracts, the Critical Software Vendor, and the Goods Provider are all critical to the Debtor's operations. Any interruption in service by these critical vendors will cause an immediate and adverse impact on the Debtor's operations.

58. For the foregoing reasons, I believe that it is in the best interests of the Debtor, its estate and creditors, and all other parties in interest that the Court grant the relief requested in the Critical Vendor Motion.

## V. CONCLUSION

59. The Debtor's immediate objective is to continue to operate its businesses with as little interruption or disruption as possible to minimize any loss of value during the pendency of the Case. I believe that if the Court grants the relief requested in the First Day Pleadings, the prospect for achieving these objectives will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed: May 23, 2016.

_____
Robert E. Wichert, M.S., P.E.
Executive Vice President, Chief Operating Officer
Acting Interim President and Chief Executive Officer
Whistler Energy II, LLC

8663427v.3