UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                              CASE NO. 16-10661

WHISTLER ENERGY II, LLC                             SECTION "B"

        DEBTOR                                      CHAPTER 11

## MEMORANDUM OPINION

This matter came before the court on December 12, 13, 19 and 28, 2016 as a hearing on Nabors Offshore Corporation's ("Nabors") Motion for Allowance of Administrative Expense Claim (P-354), and the objections thereto.  At the same time Apollo Franklin Partnership L.P., Apollo Centre Street Partnership, Apollo Special Opportunities Managed Account, LP, Apollo Credit Opportunity Fund III AIV I LP, ANS Holdings (WE), Ltd., and Apollo Management, LP's ("Apollo) Objection to Claim 48 by Nabors Offshore Corporation (P-438) was heard.  Considering the testimony and evidence presented by the parties, and for the reasons set forth below, the court finds that Nabors is entitled to an administrative priority claim for a part of its post-petition services.  Nabors is also entitled to a general unsecured claim in the amount of $6,967,925.98.  Nabors has not shown that it is entitled to a gap period claim.

## I.      Background Facts

The debtor in this case, Whistler Energy II, LLC (referred to alternatively as "Whistler", the "debtor", or the "debtor-in-possession" as the case may be), owns a platform for oil and gas production in the Gulf of Mexico known as Green Canyon 18.

On February 25, 2014 the debtor and Nabors entered into a drilling contract whereby Nabors placed a drilling rig, MODS 201, on the debtor's platform.[1]  On March 10, 2016 there was an accident on the rig that resulted in the death of a Nabors' employee.  The drilling operations were shut down the next day by the United States Bureau of Safety and Environmental Enforcement ("BSEE").  On March 24, 2016, an involuntary bankruptcy petition was filed against Whistler by several of its creditors.  On May 25, 2016, Whistler  consented to the entry of an order for relief under Chapter 11 of the U.S. Bankruptcy Code.[2]

Nabors seeks a gap period claim in the amount of $2,264,690.88, an administrative priority claim for work performed prior to demobilization in the amount of $4,320,364.78, and an administrative priority claim for the demobilization in the amount of $2,647,561.20.[3]  The debtor-in-possession, Apollo, and the Unsecured Creditors' Committee ("UCC") object to most of Nabors' motion for administrative priority on the basis that most of Nabors' claim is more properly classified as a general unsecured claim. The dispute focuses on both the interpretation of the force majeure clause in the contract between Whistler and Nabors, and on the law regarding administrative claims and

---

[1]  For a graphic timeline of the pertinent events in this case, see Appendix 1 to this opinion.

[2]  11 U.S.C. §101 *et seq.*, hereinafter often referred to only by section numbers.

[3]  The various pleadings in this case have differing numbers as to the claim amounts. At the beginning of the trial in this matter, the parties stipulated that these were the correct amounts. Near the end of the trial, an amended stipulation was filed but there is still some confusion as to the amount of administrative costs that Whistler admits is due to Nabors.

contract rejection.

## II.   <u>Legal Analysis</u>

### A.   **The Force Majeure clause in the contract and the Gap Period**

The gap period in this case is the time between March 24, 2016 when the involuntary petition was filed, and May 25, 2016 when the order for relief was entered. Section 507(a)(3) gives a second priority to claims "arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee and the order for relief."[4]  These claims are treated as if the claim had arisen before the date of the filing of the petition.  Nabors' proof of claim asserts a § 507(a)(3) claim in the amount of $2,264,690.88.[5]

Whistler, Apollo and the UCC contend that the entire gap period claim is governed by the force majeure language in the contract.  Whistler, Apollo and the UCC argue that the force majeure provision of the contract went into effect right after the accident of March 10, 2016 that resulted in the death of Nabors' employee.  There are two clauses in the contract that pertain to a force majeure event.  The first, at paragraph 7.7 states:

---

[4]  11 U.S.C. § 502(f).

[5]  Proof of Claim number 48, Exhibit A-2.  The amount in the proof of claim was actually $2,303,831.13, but was later amended through stipulation at trial to $2,264,690.88.  The proof of claim also asserts a claim for pre-petition services in the amount of $2,376,334.67.  The objection to the proof of claim does not object to the pre-petition amount; the objection also states that Apollo is reserving its right to file additional objections to Nabors' proof of claim as regards the pre-petition claim.  At trial, the parties in no way addressed the pre-petition proof of claim, so the court will not make a ruling on Nabors' pre-petition claim in this memorandum opinion and the accompanying order.

The Force Majeure Rate specified in Appendix A will be payable during
any period in which operations are not being carried on because of Force
Majeure as defined in Paragraph 13.3, including periods required to repair
damage caused by a Force Majeure event, up to a maximum of ten (10)
consecutive days, after which and during the continuous existence of the
Force Majeure condition no day rate will be payable and the Contract may
be terminated at the option of either party, subject to demobilization as
provided in Paragraph 7.3.[6]

The second clause, which is at paragraph 13.3 states:

Except as otherwise provided in this Paragraph 13.3, each party to this
Contract shall be excused from complying with the terms of this Contract,
except for the payment of monies when due, if and for so long as such
compliance is hindered or prevented by riots, strikes, wars (declared or
undeclared), insurrections, rebellions, terrorist acts, civil disturbances,
dispositions or orders of governmental authority, whether such authority be
actual or assumed, acts of God (except however adverse sea or weather
conditions other than named storm hurricanes), inability to obtain
equipment, supplies or fuel, or by any act or cause (other than financial
distress or inability to pay debts when due) which is reasonably beyond the
control of such party, such cause being herein sometimes called "Force
Majeure."  In the event that either party hereto is rendered unable, wholly or
in part, by any of these causes to carry out its obligation under this Contract,
such party shall give notice and details of Force Majeure in writing to the
other party as promptly as possible after its occurrence.  In such cases, the
obligations of the party giving notice shall be suspended during the
continuance of any inability so causes except that Operator shall be obliged
to pay to Contractor the Force Majeure Rate provided for in Paragraph 7.7.[7]

At trial, the court was under the impression that all parties agreed that the Force

Majeure clause went into effect on March 11, 2016, after the accident, and that after the

---

[6] Trial Exhibit 1 at ¶ 7.7.

[7] Trial Exhibit 1 at ¶ 13.3.

ten days specified in the Force Majeure clause expired on March 21, 2016, no day rate was to be charged.  In its post-trial brief, however, Nabors argues for the first time, that no force majeure rate was ever in effect because Whistler did not timely notify Nabors that a force majeure event had occurred.  The parties also disagree as to when the force majeure event ended.

### 1.    Notice of Force Majeure

First the court will address Nabors' newly raised argument that the force majeure notice was not timely.  The court rejects this argument for several reasons: 1) both parties were unarguably aware of the incident on March 10, 2016 resulting in the death of Nabors' employee  and the almost immediate orders from BSEE shutting down the drilling operations - the basis of the force majeure declaration; 2) Whistler issued the written notice of force majeure after it received its Notification of Incident(s) of Non-Compliance ("INC") from BSEE notifying Whistler that it would not be able to resume drilling operations; 3) the language of the contract at paragraph 13.3 requiring the notice in writing to the other party states that the notice shall be given "*as promptly as possible*"; and 4) Nabors' own invoice dated April 4, 2016 clearly states that the force majeure rate went into effect on March 11, 2016 and ended on March 21, 2016.[8]

The incident causing the death of Nabors' employee occurred on March 10, 2016, and resulted in an almost immediate shutdown of the drilling rig.  On March 11, 2016

---

[8]   Trial Exhibit 2.24.

BSEE issued a Preservation Order requiring the debtor and its, "employees, officers, directors, agents, affiliates, contractors, and subsidiary and parent companies" to take all necessary action to "identify, retain, and preserve" all potentially relevant information related to the incident.[9]  This order was sent via email to Robert Wichert at Whistler;[10] Wichert then forwarded the order, again via email, to several people including management at Nabors.  BSEE next issued a written notice of INC to the debtor on March 25, 2016, and issued a separate written notice of INC to Nabors on March 29, 2016.[11] Whistler then sent a written notice of force majeure to Nabors on March 30, 2016.[12]

The argument by Nabors that the notice of force majeure was untimely on March 30, 2016 is a stretch.  The language in the contract states that notice shall be given "as promptly as possible."  Of course it's possible that Whistler could have given notice the day after the incident, but it does not seem unreasonable to this court that following the death of a person on its platform, giving notice of force majeure to Nabors was not at the top of the Whistler's to-do list.  Nabors was very much aware on March 11, 2016 that the drilling operations had been shut down by BSEE, and at trial Nabors did not show any prejudice that it suffered as a result of the time between the incident on March 10 and the

---

[9]  Trial Exhibit 23.

[10]  At that time, Wichert was the Executive Vice President and Chief Operating Officer of Whistler.  He has since become the Chief Executive Officer.

[11]  Trial Exhibits 27 and 71.  The issuance of an INC to Nabors, separate and apart from the INC to Whistler was unusual.  *See* Trial transcript 12/13/16 at p. 72.

[12]  Trial Exhibit 32.

written notice it received on March 30.

Finally, in an invoice dated April 4, 2016, issued well before Nabors formulated its legal argument that the force majeure clause could not be invoked because of untimely notice, Nabors billed Whistler for services at the force majeure rate from March 11 to March 20.  This suggests that initially, Nabors did not contest the invocation of the force majeure clause immediately after the March 10th incident. Further, on May 12, 2016 in a letter to Whistler, Nabors also acknowledged the force majeure rate had been in effect, noted that Nabors could not continue to provide equipment and crews indefinitely while being paid at the zero (0) rate in effect because of the force majeure, and proposing a standby rate of $28,000 per day for the duration of the period that drilling would be suspended.[13]  This letter provides further indication that at least until May 12, 2016 Nabors considered the force majeure to be in effect.

The court finds, in view of the facts known to all parties, that Whistler sent the written notice of force majeure in a timely manner in compliance with the drilling contract.

## 2.        The end of force majeure

A second area where the parties disagree, is when the force majeure event ended. Whistler, Apollo and the UCC contend that the force majeure ended on June 14, 2016 when BSEE lifted the drilling suspension order and approved the Performance

---

[13]  Trial Exhibit 41.

Improvement Plan ("PIP") it had required Whistler and Nabors to provide.  Nabors

contends that the force majeure ended on April 15, 2016.  Nabors argues that even though

the BSEE order suspending drilling was still in effect on April 15, 2016 the debtor should

have been able to get the suspension order lifted by then because at that point the PIP

should have been developed to such an extent that BSEE could have approved it, and the

failure to get it approved by April 15 rested entirely on Whistler.  The court finds that the

evidence and testimony presented at trial do not support Nabors' conclusion.

　　　After the accident, Whistler received an INC from BSEE on March 25, 2016.[14]

Nabors also received its own INC on March 29, 2016.[15]  Representatives of both Whistler

and Nabors testified that there were several meetings with BSEE.  Representatives from

both Whistler and Nabors met with BSEE officials on March 23, 2016, to discuss the

incident and the "safety culture" on the rig.[16] On March 30, 2016, Robert Wichert, the

CEO of Whistler submitted to BSEE a response to the March 25 INC to Whistler.[17]  On

April 15, 2016 Whistler sent a request to BSEE asking to be allowed to resume well

---

[14]  Trial Exhibit 27.  Robert Wichert, the president and CEO of Whistler, testified that a representative of BSEE hand delivered the INC to the rig on March 25, 2016.  Trial transcript dated 12/19/16 at p. 273.

[15]  Trial Exhibit 71.  Mark Pankhurst, Nabors' area manager for the Gulf of Mexico, testified that a representative of BSEE had hand delivered the INC to Nabors' New Iberia office. Trial transcript of 12/12/16 at p. 154.

[16]  Testimony of William Hunter, the manager of quality control, health, safety and environment for Whistler ("QCHSE manager"). Trial transcript dated 12/19/16 at p. 75-76

[17]  Trial Exhibits 27, 29, and 31.

operations; this was denied on April 20, 2016, when BSEE officials inspected the rig.[18]

On or about April 17, the damaged parts of the rig were replaced.  On May 4, 2016

Nabors responded to the March 29, 2016 INC it had received from BSEE.[19]  There was

another meeting with BSEE to discuss the PIP on May 17, 2018, and the next day, May

18, Nabors held a training session to address the safety protocols that had been developed

in the PIP; another requirement of BSEE.  Whistler's QCHSE manager attended and

participated in this training of Nabors personnel.[20]  There was also further training of rig

personnel because BSEE required everyone on the facility to redo the facility

orientation.[21]  The evidence presented at trial showed that both Whistler and Nabors were

continuously engaged with BSEE from the time of the accident until June 14, 2016 in an

attempt to satisfy BSEE so that the drilling order suspension would be lifted.  No drilling

could be done on the rig until the drilling order suspension was lifted.

The force majeure clause states that if compliance with the contract is hindered or

prevented by an order of governmental authority, then the obligations of the party giving

notice (in this case Whistler) shall be suspended during the continuance of any inability

so caused except that the Operator shall be obliged to pay to Contractor the Force

---

[18]  Trial Exhibits 34 and 36.

[19]  Trial Exhibit 71.

[20]  Trial transcript of 12/19/16 at p. 101-102.

[21]  *Id* at p.103.

Majeure Rate.[22]  Here the event consisted of the BSEE orders not just to Whistler, but also to Nabors, prohibiting all drilling activity.[23]  Those orders were not lifted until June 14, 2016.  The case cited by Nabors for the proposition that if Whistler had acted more promptly to comply with BSEE, the force majeure event would have been shorter is inapplicable.[24]  In that case, *Perlman v. Pioneer Ltd. Partnership,* 918 F.2d 1244 (5th Cir. 1990), the court found that the party attempting to invoke the force majeure clause in the contract had "failed even to attempt to remove or overcome the purported force majeure."[25]  Here, the court finds that Whistler made numerous and ongoing attempts in cooperation with Nabors to satisfy BSEE safety requirements; those attempts eventually did lead to the lifting of the INCs, and the end of the force majeure period, so *Perlman* is not applicable.

The court finds that the force majeure event ended on June 14, 2016.  Because the force majeure event was in effect for the entire gap period, there is no gap period claim

---

[22]  Trial Exhibit 1; Platform Drilling Contract at ¶ 13.3.

[23]  As previously explained, the BSEE orders consisted of the March 11 oral order suspending drilling operations, the March 25 written notice of INC to Whistler, and the March 29 written notice of INC to Nabors.  *See also* Trial transcript of 12/13/16 at p. 71, where Todd Fox of Nabors testified that Nabors relied on BSEE's determination of when the force majeure period ended.

[24]  Nabors' argument completely ignores its own responsibility for resolving the Nabors INC, which also required resolution before the BSEE order stopping drilling could be lifted.

[25]  *Perlman* at 1249.

for Nabors.[26]

## B.     The administrative priority claims

The central question at issue with respect to the administrative priority claims in

this case is difficult to pin down.  It lies somewhere at the intersection of the law

governing the rejection of executory contracts under § 365, and the law governing

administrative claims under § 503 of the Bankruptcy Code.  Nabors states that it is

seeking an administrative claim only and that it is not seeking post-rejection breach of

contract damages;[27] the court is not sure that Nabors has a choice.

Nabors asks for an administrative priority in the amount of $4,320,364.78 from

May 25 (the date the order for relief was entered) to October 20, 2016 (the date

demobilisation began), which is calculated using the contract rate of $45,000 per day that

was in effect when the involuntary petition against Whistler was filed.  Nabors does use a

reduced daily rate of $28,000 per day for some of this time, because after July 20, it

reduced the number of its personnel on the rig.[28]  The second part of Nabors

---

[26] The drilling contract form was provided by Nabors, so if Nabors had wanted a different kind of force majeure clause, it could have written one into its contract at the outset of its business relationship with Whistler.

[27] (P-477) at p. 2 & 4-5.

[28] Trial Exhibit 3 contains Nabors' calculations for the amounts it claims it is owed, and the underlying day rates for the various periods of time.  The parties stipulated at the start of trial that Exhibit 3 represented the correct amounts that Nabors was claiming for its work, and that the figures in Exhibit 3 would replace any figures previously referenced in pleadings and proof of claim 48.  At the close of trial, the parties submitted a second set of figures which they stated amended and replaced Exhibit 3.  Those final amended figures are what the court has used in this opinion.

administrative priority claims is in the amount of $2,647,561.20 for demobilisation of the rig after October 20, 2016.  The demobilisation amount was calculated using a $63,000 per day rate provided for in the drilling contract between Whistler and Nabors.  Whistler, Apollo and the UCC object to the allowance of an administrative priority on the basis that the work performed did not qualify as an administrative expense and also because the drilling contract was rejected effective June 20, 2016.

Nabors filed a motion to compel assumption or rejection of the drilling contract with the court on June 17, 2016.[29]  On June 20, 2016 Whistler filed a response indicating that as the debtor-in-possession it was electing to reject the pre-petition contract.[30]  The court held a hearing on the matter on July 13, 2016, and on July 20, 2016 entered an order holding that the contract was rejected effective June 20, 2016.[31]

Section 365 of the Bankruptcy Code covers the assumption and rejection of executory contracts and unexpired leases.   It allows the trustee in a bankruptcy case to assume or reject any executory contract or unexpired lease of the debtor subject to court approval.  It further states:

> The rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease– if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing

---

[29]  (P-139).

[30]  (P-144).

[31]  (P-223).

of the petition.[32]

Essentially, if a trustee (or debtor-in-possession in a Chapter 11 case) elects to reject a contract between the debtor and a third party, then that act constitutes a breach of the contract immediately before the date of the filing of the petition; this leaves the other party to the contract with a general unsecured claim against the bankruptcy estate.  It is clear that at a minimum, Nabors has a general unsecured claim against the bankruptcy estate in the amounts it seeks.

Understandably, Nabors would much prefer to have an administrative priority claim rather than a general unsecured claim.  An administrative expense priority is allowed to certain expenses incurred by the debtor-in-possession after the order for relief is entered in a Chapter 11 case.  Section 503(b) provides that, "[a]fter notice and a hearing, there shall be allowed, administrative expenses, ... including– (1)(A) the actual, necessary costs and expenses of preserving the estate...."[33]  In order to qualify as an "actual and necessary cost" under § 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee or debtor-in-possession that benefitted the estate.[34]  Section 503(b)(1)(A) claims, therefore, generally stem from voluntary transactions with third parties who lend goods or services necessary to the

---

[32]  11 U.S.C. § 365(g)(1).

[33]  11 U.S.C. § 503(b)(1)(A).

[34]  *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001).

successful reorganization of the bankruptcy estate.[35]

The United States Fifth Circuit Court of Appeal stated in *Matter of TransAmerican Natural Gas Corp.,* 978 F.2d 1409 (1992) that:

> The purpose of Section 503 is to permit the debtor's business to operate for the benefit of its prepetition creditors. In order to effectuate a successful reorganization, third parties must be willing to furnish postpetition goods or services on credit. Third parties might refuse to extend credit to debtors-in-possession for fear that their claims would not be paid, but an advance payment requirement would impede the debtor's business. Section 503 requires that such claims be given priority, therefore inducing third parties to extend credit and enhancing the likelihood of a successful reorganization.[36]

The Fifth Circuit has held that the burden of proving a claim is for "actual, necessary costs and expenses of preserving the estate" falls on the creditor making the claim for an administrative expense.[37] A key requirement for an administrative priority claim is that there must have been inducement by the debtor-in-possession.[38] Where the contract between the parties was entered into pre-petition by the debtor and the creditor, the post-petition debtor-in-possession must induce performance from the creditor in order for an administrative priority to be given to the creditor's performance.

---

[35] *Id* at 387.

[36] *TransAmerican*, 978 F.2d at 1415-16, *citing In re Coastal Carriers Corp.,* 128 B.R. 400, 403 (Bankr.D.Md. 1991).

[37] *TransAmerican* at 1416.

[38] *In re United Trucking Serv., Inc.,* 851 F.2d 159, 162 (6th Cir. 1988); *Matter of Jartran,* 732 F.2d 584, 586-88 (7th Cir. 1984); *In re Enron Corp.,* 279 B.R. 79 (Bankr.S.D.N.Y. 2002) (considering inducement by debtor-in-possession to be a crucial element comports with policy reason for allowing the priority).

14

1.    **The post-rejection, pre-demobilisation period from June 20, 2016 to October 20, 2016.**

*In re Enron Corp.,* 279 B.R. 79 (Bankr.S.D.N.Y. 2002) holds that where there is partial use of a creditor's property, administrative priority status only applies to a claim based on the portion actually used by the debtor-in-possession.[39]  The court finds the *Enron* case persuasive.  In *Enron* the debtor and creditor had entered into a pre-petition contact providing pipeline capacity for the transportation of natural gas to the debtor.  The question in that case, was whether the continued provision of the pipeline capacity post-petition to the debtor-in-possession entitled the creditor to an administrative priority.  The *Enron* court held that although the capacity was available for a longer period, the administrative priority could only be given during the time that the pipeline capacity was actually being used by the debtor-in-possession; during the time that the pipeline capacity was not actually used, there was no benefit provided to the debtor-in-possession that would warrant an administrative priority, even though the pipeline capacity was *available* to the debtor-in-possession.

In this case, after June 20 (the contract rejection date), until October 20 (when the rig demobilisation began) Nabors's rig was still located on the debtor's platform, and Nabors' personnel were on the rig maintaining Nabors' equipment, although there was no drilling activity being performed.  During this period, the debtor-in-possession used some services provided by Nabors.  Whistler does not believe that the amount due under the

_____

[39]  *In re Enron Corp.*, 279 B.R. 79, 90 (Bankr.S.D.N.Y. 2002).

15

contractual daily rate for this whole time period should be elevated to an administrative priority claim.  Rather, Whistler argues that Nabors should receive an administrative priority claim for the services the debtor-in-possession actually used.  These services included, among other things, the use of the crane and the crane operator, the living quarters supplied by Nabors for the use of Whistler's crew, and labor charges for tasks Whistler requested the Nabors' crew perform.

Nabors argues  that it is entitled to its daily rate under the contract for this entire time its rig was on the debtor-in-possession's platform.  In support of its argument Nabors argues that its rig and personnel remained on the platform after its contract had been rejected because the debtor and Apollo had asked it to remain.  This is what constitutes the inducement in Nabors' view.  Not surprisingly, Whistler, Apollo and the UCC disagree.

At trial, the following facts were established: Nabors and Whistler signed the drilling contract on February 25, 2014; the drilling contract stated that Whistler "desires to have offshore well drilled or worked over in the Operating Area and to have performed or carried out all auxiliary operations and services detailed in the Appendices hereto or as Operator may require."[40]  Pursuant to the contract, Nabors placed a drilling rig on Whistler's platform, and drilling operations commenced, with the goal of drilling wells. Production operations separate and apart from the drilling operations Nabors' had been

---

[40] Trial Exhibit 1 at p. 1.2.  Appendix A to the contract stated that the contract was to be for "two (2) firm wells."

contracted to perform were ongoing on the platform and not interrupted or interfered with by Nabors' drilling contract.[41]  Contractors other than Nabors were in charge of the production operations.

Following the incident resulting in the death of Nabors' employee, BSEE almost immediately ordered that the drilling operations stop.  BSEE did not order that the production operations stop, and production operations did not stop.  There were lengthy discussions of how to implement proper safety measures between BSEE, Whistler, and Nabors after the initial oral order stopping the drilling.  BSEE had several requirements that Whistler and Nabors had to fulfill before BSEE would lift its orders as discussed *infra* in the force majeure portion of this opinion.  Eventually, BSEE allowed Whistler to temporarily abandon the well.  It was not completely clear to the court whether the decision to temporarily abandon the well was made because Whistler no longer wished to complete the well because of the bankruptcy, because of market conditions, or because of some other reason, but that distinction does not seem to be important.

The work required to temporarily abandon the well took place between June 14 and June 20, 2016, and Whistler paid for that work.  On June 17, Nabors filed a motion with this court to compel Whistler to assume or reject the drilling contract.  On June 20, Whistler filed a reply stating that it wished to reject the contract.  A hearing was held, and on July 20, 2016 the court granted the motion and ordered that the rejection was effective

---

[41]  Production from the platform was interrupted at one time by a problem with the Shell pipeline, but that cessation of production had nothing to do with the drilling contract.

as of June 20, 2016.

On July 25, 2016, Whistler requested that Nabors provide it with a demobilisation plan. The plan was required by and had to be approved by BSEE. Nabors did not submit the plan until September 8, and it took until October 4, 2016 for BSEE to approve the plan. This was at least in part because care had to be taken not to interfere with Whistler's ongoing production operations. Once approval was obtained, Whistler commenced on October 20 to dismantle and remove its rig from Whistler's platform, and the demobilisation was completed by the end of the trial.[42]

There was lengthy testimony as to the work performed by Nabors between June 20 and October 20. Exhibit 9, introduced into evidence, contains all of the reports that detail the services provided by Nabors beginning on the petition date, March 24, 2016. Nabors states that it performed maintenance services and assisted other Whistler contractors with the performance of production duties, which in Nabors' view constitutes a benefit to the estate. The court finds that with the exception of the services specifically requested by the debtor-in-possession during this time (and which the debtor-in-possession agrees that it asked for and has agreed to pay for),[43] the services provided are akin to Nabors being *available* to provide services, as opposed to Nabors *actually providing* services to the debtor-in-possession. Because the requirement for an administrative priority expense is

---

[42] On the last day of trial, the parties updated Trial Exhibit 3 to reflect the final costs of the demobilisation.

[43] Details about these services and their costs will be discussed in the next section.

18

that the creditor provide the debtor-in-possession with actual and necessary services that

benefitted the estate, that the services were induced by the debtor-in-possession, the court

finds that Nabors did not prove at trial that it provided services from June 20 to October

20 such that it is entitled to receive administrative priority at its day rate during that

period.[44]

Although Nabors put on some evidence that it was induced by the debtor-in-

possession to leave its rig on the platform after the rejection date, the court finds that

evidence shows that Nabors and the debtor-in-possession were simply engaged in post-

petition negotiations that are typical of the bankruptcy process.  There were discussions

about trying to classify Nabors as a critical vendor that did not bear fruit.[45]  What is clear

to the court is that Nabors was sufficiently unsure of its position vis-a-vis the debtor-in-

possession that it was motivated to file a motion to assume or reject the drilling contract

on June 17, 2016.  When the debtor-in-possession filed its response three days later on

June 20, 2016 stating that it planned to reject the Nabors drilling contract, it should have

been clear to Nabors that the contractual relationship would not be continued.[46]  Based on

---

[44]  Again, the court is not holding that Nabors does not have a claim against the estate for its day rate; the court is holding that this claim is not an administrative priority claim.

[45]  Trial transcript of 12/13/16 at p. 32-33.  Todd Fox of Nabors testified that on April 1, 2016 there was a metting at Whistler's headquarters in which critical vendor status was discussed.

[46]  Todd Fox of Nabors testified that he was unclear about the effect of the rejection because he thought that they would have to reach some kind of agreement on ongoing operations, but the legal effect of the rejection does not change simply because the creditor does not understand that legal effect.  Trial transcript of 12/13/16 at p. 75.

the evidence presented to the court in this case, after June 20, Nabors was on notice that the debtor-in-possession had chosen to reject the drilling contract but has not shown that it was induced to stay and perform under the contract after the June 20, 2016 rejection date.[47]

### 2. Demobilisation

Once Nabors began demobilisation on October 20, 2016, it was actually providing services that were requested by the debtor-in-possession. Thus the court must determine whether the demobilisation services provided a benefit to the estate. There are several cases cited by Nabors that have found that services or funds that help a debtor-in-possession to fulfill its environmental obligations under state or federal law can qualify as administrative priority expenses.

In *Matter of H.L.S. Energy Co., Inc.,* 151 F.3d 434 (5th Cir. 1998) the court addressed a situation wherein the debtor was unable to comply with a requirement by the State of Texas that inactive wells be plugged. Accordingly, the Chapter 11 trustee in the case agreed that the State could plug the wells and charge the costs to the bankruptcy estate. When the case converted to a Chapter 7, the Chapter 7 trustee objected to the State's claim for an administrative priority. The Fifth Circuit held that the State's claim was entitled to an administrative priority because the plugging obligation arose post-

---

[47] There was testimony that after Whistler rejected the contract, Whistler and Nabors continued to discuss completing the well, but the actual substance of those conversations was not made clear to the court and also did not seem to clearly indicate inducement by the debtor-in-possession. Trial transcript of 12/13/16 at p. 77.

petition, and the trustee was required to comply with the Texas law requiring the wells be plugged. The court further reasoned that the fulfillment of the estate's obligation to plug the well constituted a benefit to the estate, and thus was afforded administrative priority. *In re American Coastal Energy, Inc.,* 399 B.R. 805 (Bankr.S.D.Tex. 2009) presents a similar problem and comes to a similar conclusion. *American Coastal* lists many environmental cases that are all similar in that the claim for administrative priority is being made by the state agency that was saddled with the costs of cleaning up the debtor's mess.

The court finds that these cases are not on point with the case before this court. Here, Whistler worked with BSEE to come to the decision that the well should be temporarily abandoned; the work required to temporarily abandon the well was performed by Nabors and paid for by Whistler. According to the testimony of Todd Fox, a Nabors' vice president, that was the end of Whistler's obligation to make the well safe.[48] At the time of trial, the well was in compliance with BSEE regulations. At some point in the future, Whistler may decide to reopen the well, or Whistler may decide to permanently abandon the well. That is not something this court need concern itself with at this time.

The demobilisation of Nabors' rig is an entirely separate matter from the environmental obligations that existed in the cases cited by Nabors. Demobilisation is simply the removal of Nabors' rig from Whistler's platform. It is a consequence of the

---

[48] Trial transcript of 12/13/16 at p. 47.

debtor-in-possession's decision to reject the drilling contract.  Once the contract was

rejected, there was no longer a need for the rig to occupy space on Whistler's platform.

The contract itself, provides for demobilisation at the end of the contract.  Although

rejection of a contract does not terminate the contract, it does mean that the debtor-in-

possession has made a decision that it is not in its best interest to continue the contractual

relationship.  Thus, the parties to the contract should wind up their business relationship

and part ways.  This particular business relationship entailed the placement of large and

heavily regulated equipment on a platform in the Gulf of Mexico.  The removal of that

equipment, also subject to heavy regulation, is of course a lengthy and expensive process,

but that does not necessarily confer administrative priority on the demobilisation process.

The contract did call for payment for the demobilisation process, and Nabors is entitled to

a claim against the bankruptcy estate in the amount of what the contract calls for, but that

claim is a general unsecured claim, not an administrative priority claim.  Nabors has not

shown that it is entitled to be paid ahead of Whistler's other creditors for the

demobilisation costs.

### 3.    The allowed administrative expenses

After the petition date, Whistler requested the use of Nabors' crane and crane

operator, Whistler used Nabors' living quarters to house its crew, and Whistler incurred

other expenses that it agrees are entitled to administrative priority.  The exact amount of

the cost of these services and whether some of them have already been paid is not entirely

clear to the court.  In the post trial briefs, Apollo states that Nabors is owed $897,024 for

22

these services[49] but claims it is entitled to a set off for fuel costs, meals, and other items,

bringing the actual amount Whistler thinks it should pay Nabors to $95,825; the setoff

will be discussed in the next section. The exhibits introduced at trial have other amounts.

At trial, Apollo, Whistler and the UCC offered exhibits 66, 67 and 68 to show expenses

they agree Whistler owes. Exhibit 66 states that pre-rejection, Nabors is owed $215, 029

and post-rejection, Nabors is owed $861,395. The figures in Trial Exhibit 66 do not add

up to $897,024.[50] The court agrees that Nabors should receive an administrative priority

for the services Whistler asked it to provide, but the court cannot tell from the exhibits

and the briefs what that number should be. To confuse matters further, the witnesses

testified that some post-petition work had already been paid for. After reviewing the trial

transcripts, it appears that the work Nabors did in making the rig storm safe and

temporarily abandoning the well has been paid for, but the court is not sure if some of the

other work requested by Whistler has also been paid for. Accordingly, in this opinion, the

court is holding that there is an administrative priority for the post-rejection work actually

requested by Whistler. If the parties can agree on what that number is, then Whistler

should pay it. If they cannot agree, then the court may request further briefing so it can

make a determination of that amount.

### D. Whistler's claim for offset

---

[49] (P-536) at p. 5 and (P-550) at p. 10.

[50] Additionally, Trial Exhibit 3 shows Nabors' calculations for overtime, and additional equipment charges total $425,024.16, and the UCC's post trial brief (P-551) states that Nabors' pre-rejection administrative claim should be allowed in the amount of $66,229.

Whistler agrees that Nabors should get an administrative priority claim for the services Whistler requested and actually used.  Whistler uses the rates in the contract to calculate the amount it thinks it owes.[51]  Whistler also thinks it should be allowed to offset this amount by subtracting charges it claims Nabors owes for the use of various items by Nabors.[52]  Under the contract, however, all of these costs would have been paid for by Whistler.  Essentially Whistler is arguing that it should be allowed to pay Nabors at the contract rate for the items it used post-petition, and that it should be allowed to charge Nabors at an extra-contract rate for the items Nabors used post-petition.  The court does not agree.  If Whistler is allowed to charge whatever it wants post-petition, then the court would have to allow Nabors to do the same.  The contract prices Whistler uses to calculate what it owes Nabors have built into them the assumption that Whistler is providing fuel, meals, transportation, etc.  Absent a showing that Nabors agreed to these extra charges (which it did not), the court will not allow Whistler to charge them.

## III.    <u>Conclusion</u>

For these reasons, the court finds that Nabors is allowed a general unsecured claim in the amount of $6,967,925.98.  The motion for allowance of an administrative claim is

---

[51]  Mark Pankhurst of Nabors testified that Nabors and the debtor-in-possession had agreed to use the contract rate for crane usage.  Trial transcript of 12/12/16 at p. 189.

[52]  Trial Exhibit 67 sets forth Whistler's offset claim in the amount of $512,782.  This includes the following: Fuel used by the rig, meals for Nabors' personnel, helicopter usage, vessel costs, dock costs, Safecon invoices and misc.  Unfortunately, Trial Exhibit 66 contains different numbers, as do the post-trial briefs, so again, the court is not clear as to what the actual figures are.

granted as to those limited services that Whistler actually requested after March 24, 2016,

with the exact amount yet to be determined.   The motion for allowance of the gap period

claim is denied.   The court denies Whistler's claim for set-off against Nabors.


New Orleans, Louisiana, April 4, 2017.

*J. A. Brown*

Jerry A. Brown
U.S. Bankruptcy Judge

Appendix 1

