UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                            CASE NO, 16-10661

WHISTLER ENERGY II, LLC                              SECTION "B"

       DEBTOR                                               CHAPTER 11

## **MEMORANDUM OPINION**

      The United States Fifth Circuit Court of Appeals has remanded this case to the court for further consideration consistent with the Fifth Circuit's directives in its opinion, *In the Matter of Whistler Energy II, LLC*, 931 F.3d 432 (5th Cir. 2019). The Fifth Circuit vacated part of this court's earlier decision regarding the administrative expense claim that creditor Nabors Offshore Corporation has made against the debtor's estate. Nabors' claim for an administrative expense under 11 U.S.C § 503(b)(1)(A) concerns services it provided after the debtor rejected the platform drilling contract between the debtor and Nabors. The parties agreed to file briefs on the remand issue and have briefed the matter thoroughly. The parties have also agreed that all citations used in their briefs will be to the record created on appeal ("ROA") in the Fifth Circuit. This court will also use the record on appeal as its reference point unless otherwise noted. For the reasons set forth below, the court finds that Nabors has shown it is entitled to an administrative expense claim for the time from September 8 to October 20, 2016.

      The Fifth Circuit held that "when the debtor-in-possession induces availability and the bankruptcy estate derives a benefit from it, the ordinary cost of ensuring such availability qualifies as an administrative expense."[1] The Fifth Circuit has asked this court to determine: 1) whether Whistler induced Nabors to stay on the platform; 2) the length of time Nabors stayed on

---

[1] *Matter of Whistler,* 931 F.3d at 443.

1

the platform because of Whistler's post-petition needs; and 3) the actual and necessary costs of staying on the platform during this time period.[2]

In their post-remand briefing, the parties are no closer to agreement than they were at the outset of this case. Nabors argues that Whistler induced it to stay on the platform for the entire period in question. Whistler disagrees and argues that Nabors stayed for its own benefit, and it did not induce Nabors to remain for any of the time in question. As the Fifth Circuit noted, an administrative expense classification allows the creditor, here Nabors, to be paid at the expense of the debtor's other unsecured creditors.[3] Thus, "the claimant seeking administrative expenses bears the burden of proof."[4] The words "actual" and "necessary" have been construed narrowly: "the debt must benefit [the] estate and its creditors." *NL Indus., Inc. v. GHR Energy Corp.*, 940 F.2d 957, 966 (5th Cir.1991), *cert. denied,* 502 U.S. 1032, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992). A prima facie case under § 503(b)(1) may be established by evidence that (1) the claim arises from a transaction with the debtor-in-possession; and (2) the goods or services supplied enhanced the ability of the debtor-in-possession's business to function as a going concern. *Matter of TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992). After the movant has established a prima facie case, the burden of producing evidence shifts to the objector; but the burden of persuasion, by a preponderance of the evidence, remains with the movant. *TransAmerican,* 978 F.2d at 1416.

**A.     Whether Whistler induced Nabors to remain on the platform.**

In its opinion remanding this case, the Fifth Circuit stated: "Consistent with the decisions of our sister circuits, we hold that a creditor can establish that its expenses are attributable to the

---

[2] *Id* at 446.
[3] *Matter of Whistler,* 931 F.3d at 441, citing *Jack/Wade Drilling, Inc.* 258 F.3d 385, 389 (5th Cir. 2001).
[4] *Matter of Whistler,* 931 F.3d at 441, citing *In re TransAmerican Nat. Gas Corp.,* 978 F.2d 1409, 1416 (5th Cir, 1992).

2

actions of the bankruptcy estate through evidence of either a direct request from the debtor-in-possession or other inducement via the knowing and voluntary post-petition acceptance of desired goods or services."[5]

A brief factual summary is in order. The matter on remand concerns the drilling contract between Whistler and Nabors. The time period at issue is June 20, 2016 to October 20, 2016. Nabors filed a motion to require Whistler to assume or reject the drilling contract on June 17, 2016. Three days later on June 20, 2016 Whistler filed a notice into the record that it intended to reject the drilling contract. The matter was set for hearing, and on July 20, 2016 the court entered an order rejecting the contract retroactive to June 20, 2016, which was the day that Whistler declared it intended to reject the contract. On July 25, 2016, Whistler sent a formal demand letter to Nabors requesting that it provide Whistler with a demobilization plan.[6] On September 8, 2016 Nabors sent the demobilization plan. On October 20, 2016 demobilization commenced. It finished approximately 28 days later.[7]

Nabors argues that during the entire period between contract rejection and demobilization, Whistler induced Nabors to keep it's drilling rig on the platform and so it is entitled to a total administrative claim in the amount of $3,631,282.90. Some of this was already awarded by this court and affirmed by the Fifth Circuit, so Nabors now seeks an additional $3,132,758.90.[8] Nabors argues that Whistler delayed demobilization until BSEE approved a

---

[5] *Id.* at 443.
[6] ROA 6239.
[7] Trial transcript dated 12/12/16 at p. 111, R. Doc 636 in bankruptcy case.
[8] Nabors does not provide the court with an explanation of how it arrived at this amount other than to refer to ROA 5020, which was a stipulation the parties entered into at the trial setting forth the amounts of the various claims made by Nabors. Nabors states that these are "Pre-Demobilization Day Rate Charges" during the Subject Time Period, which it defines as the time between June 21, 2016 and October 20, 2016. Nabors asserts it is entitled to a reduced day rate of $28,000 per day for this time period. According to the court's calculations, that time period is 121 days, which at a day rate of $28,000 should equal $3,388,000. Nabors made some deductions to this to reach the $3,132,758.90 figure. The court suspects the deductions are to account for money already paid by Whistler for the use of Nabors' cranes and living quarters, but the court does not know this for certain.

production shut in waiver and confirmed that the preservation order issued in connection with the death of Nabors' worker on the drilling rig was lifted. Nabors also argues that it was trying to accommodate Whistler's need to maintain its production operations while demobilization was occurring, and this caused delay in commencing demobilization. Additionally, Nabors argues that demobilization was delayed because it was in negotiations with Whistler and Apollo, Whistler's secured creditor, to determine whether the rig could or should be left on the platform in case Whistler eventually decided to resume drilling operations.

The court will first address Nabors' arguments that it was trying to accommodate Whistler's need to maintain its production operations during demobilization, and that Whistler delayed demobilization until BSEE approved a production shut in waiver and confirmed that the preservation order was lifted. Whistler sent emails to BSEE regarding a production shut in waiver and confirmation that the preservation order related to the fatality on the rig did not apply to demobilization.[9] Nabors contends that Whistler delayed demobilization because it did not request the waiver and the preservation order release earlier. Whistler answers this by stating that these were formalities to be complied with and they could have requested these from BSEE at any time. Given the tenor of the emails and the explanation of Robert Wichert in his trial testimony, the court finds that Whistler did not delay demobilization by not making these requests earlier.[10] The evidence at trial shows that once made the requests were immediately approved; further, the record does not support the conclusion that the requests were a reason for the delay in commencing demobilization.

---

[9] Trial Exhibit 58, ROA 6287; Trial Exhibit 59, ROA 6291; Trial Exhibit 60, ROA 6294; Trial Exhibit 61, ROA 6298; Trial Exhibit 63, ROA 6304.
[10] Trial transcript dated 12/28/16 at pp. 33-34; 37-38; 143-44, R. Doc 643 in bankruptcy case.

Nabors also references the statement by this court that the demobilization plan "was required by and had to be approved by BSEE," and that the timing of the demobilization "was at least in part because care had to be taken not to interfere with Whistler's ongoing production operations. This court erred in its first decision in this case by finding that the demobilization plan itself required BSEE approval. Rather, BSEE only needed to be notified of the demobilization.[11] Only the production shut in waiver and the preservation order release required BSEE approval. Additionally, after reviewing the record again, the court finds that it was only <u>after</u> the demobilization plan was submitted that there were discussions about how to demobilize the rig while allowing production operations to continue.[12] Because these discussions did not take place until after the demobilization plan was submitted, the court finds that any consideration of accommodating Whistler's production operations did not delay Nabors' submission of the demobilization plan.

As stated in the court's original decision in this matter, after June 20, 2016, Nabors was on notice that Whistler was terminating the drilling contract. Whistler filed a notice with the court stating that it intended to reject the contract on June 20, 2016. Nabors performed the work to temporarily abandon the well that the parties had worked to drill, and that work was completed on June 20, 2016. Additionally, on June 21, 2016 Whistler filed a report with BSEE indicating that the well had been temporarily abandoned.[13] Mark Pankhurst, Nabors' area manager for the Gulf of Mexico, testified that the temporary abandonment work would not have been necessary if there was going to be further drilling.[14] Robert Wichert, Whistler's interim

---

[11] Trial Exhibit 58, ROA 6287. There is trial testimony by Mark Pankhurst of Nabors that Whistler had to get BSEE approval for demobilization, but Exhibit 58 shows that is not the case. *See also,* Trial transcript dated 12/12/16 at pp. 164-67, R. Doc 636 in bankruptcy case.
[12] Trial transcript dated 12/13/16 at p. 71, R. Doc. 637 in bankruptcy case.
[13] Trial Exhibit 16, ROA 6069.
[14] Trial transcript dated 12/12/16 at pp. 88-89, R. Doc 636 in bankruptcy case.

president and Chief Executive Officer, testified that if Whistler had wanted to recommence drilling after the temporary abandonment of the well, it would have had to get a new drilling permit from BSEE, enter into a new drilling contract with Nabors, and drill out the plugs that had been placed in the well when it was temporarily abandoned.[15] This supports Whistler's argument that it did not need Nabors to remain on the platform because it was not planning any further drilling operations. The court finds that Nabors has not carried its burden of persuasion that concerns about disrupting Whistler's production operations was a reason for delay in demobilization. Nor has Nabors shown that Whistler delayed demobilization with its requests for the production shut-in waiver and the preservation order release.

Nabors also argues that negotiations between the parties about whether to continue drilling to complete the A-13 Well delayed demobilization and constitute inducement by Whistler. There was testimony from Todd Fox, vice president of Nabors' Southern Division, that Nabors and Whistler discussed leaving the drilling rig on the platform in case Whistler decided that it would try to finish drilling the well that had been temporarily abandoned. "There were multiple conversations, text messages, and the like between myself and Robert Wichert concerning potential options to continue with the rig on the platform in order to TD the well that was nearly completed."[16] Fox does not indicate when those conversations took place. Testimony by Mr. Pankhurst in the trial transcripts indicate some confusion as to when that might have been.[17] Additionally, when Nabors' attorney questioned Whistler CEO Wichert about it, he indicated that he thought those conversations took place before the July 25 letter

---

[15] Trial transcript dated 12/28/16 at p. 22, R. Doc 643 in bankruptcy case.
[16] Trial transcript dated 12/13/16 at p. 70, R. Doc. 637 in bankruptcy case.
[17] Trial transcript dated 12/12/16 at pp. 101-107, R. Doc 636 in bankruptcy case. There was confusion as to whether the conversations took place before July 25, 2016 or around September 7, 2016. In the end, it appears that the discussions took place before July 25, but that is not entirely clear, and the court cannot be certain of dates of negotiations and discussions on this topic.

6

requesting a demobilization plan, although when asked by counsel if discussions also took place after July 25, he stated, "We could have, yes."[18] Nothing in the record, however shows that there were any discussions regarding leaving the rig on the platform for purposes of continuing drilling at a later time that took place between June 20 and September 8, 2016. If, as Fox stated, there were "multiple conversations, text messages and the like" during that time period, none of them are in the record. There were many other emails, letters and even text messages between the parties that were entered into evidence, but none that took place between June 20 and September 8, 2016. The only piece of correspondence in the record during this time period is a letter dated July 6, 2016 from Whistler to BSEE constituting a Notice of Minor Modification that informed BSEE that Whistler would be installing a crane in anticipation that "Nabors will lay down the two Nabors Module cranes and place them out-of-service."[19] This supports Whistler's argument that it was not contemplating any further drilling operations.

Nabors points to the email it sent to Whistler on September 8, 2016 as evidence of ongoing negotiations. Part of the email states:

> As you may be aware, Nabors has deferred commencing demobilization to allow for the discussions to conclude between Nabors, Whistler, Apollo and the Creditors' Committee on completion of A-13 well. We have been advised by Nabors' legal counsel that the parties have been unable to reach an agreement on completion of the well at this time and Apollo rejected Nabors' prior proposal to provide Apollo an option period to complete the well. Accordingly, Nabors will at this time move forward with demobilization as previously requested by Whistler following Whistler's rejection of the drilling contract.[20]

The problem with this is it doesn't show <u>when</u> discussions were concluded, which is the key information the court needs. The court held an emergency hearing on July 19, 2016 related to problems with Nabors placing equipment on its helideck so that it could not be used for

---

[18] Trial transcript dated 12/28/16 at pp. 140-41, R. Doc 643 in bankruptcy case.
[19] Trial Exhibit 55, ROA 6227.
[20] Trial Exhibit 57, ROA 6241.

7

helicopters to land. At that hearing, Nabors' counsel stated, "Now, Nabors needs to demobilize, we understand that. The contract has been rejected."[21] At no point in that hearing was any mention made of ongoing negotiations to resume drilling the A-13 well. In fact, at one point, during that hearing, counsel for Whistler suggested that Nabors could just remove its helideck and the living quarters so that Whistler could use its own helideck, and Nabors' counsel stated that if Nabors did so, then there would be nowhere for Nabors' personnel to stay when they were demobilizing the rig.[22] Additionally, the court reviewed the recording of the July 13, 2016 hearing on the motion to compel assumption or rejection of the Nabors contract, and at no time did Nabors' counsel make any mention of ongoing negotiations to recommence drilling or indicate that demobilization was not imminent. Nabors' counsel did state that demobilization process would take some time, but at that point, the court was under the impression that it would commence quickly.

    The court finds that based on the record before it, Nabors has not carried its burden to show that any discussions between the parties pertaining to leaving the rig in place that may have occurred extended beyond the June 20, 2016 response filed by Whistler agreeing to reject the contract. Given the interactions between the parties that are documented in the record, the court finds that June 20, 2016 was the end of any possible inducement through direct request by Whistler for Nabors to remain on the platform. But the court must also examine whether there was "other inducement via the knowing and voluntary post-petition acceptance of desired goods and services."[23]

---

[21] Transcript dated July 19, 2016 at p. 12, R.Doc. 230 in bankruptcy case.
[22] *Id.*
[23] *Matter of Whistler* at 443.

Nabors argues in its brief that it provided the following services to Whistler following rejection of the contract: 1) maintained all Nabors equipment on the platform so that it was operational and could be demobilized once demobilization began; 2) operated Nabors' cranes; 3) operated Nabors' generators, which powered the living quarters and helideck; 4) assisted other contractors as directed by Whistler; 5) drafted daily reports for Whistler's approval; 6) attended daily operational and weekly safety meetings presided over by Whistler; and 7) performed services as directed by Whistler as reflected in the daily reports.

The daily drilling reports do show that Nabors assisted other contractors on some of the days at the end of June and the first part of July. By way of example, on June 27, 216 the report states that Nabors "move[d] equipment around platform for UPCS Construction crew." On June 29, 2016, Nabors "assisted Empire with rigging down scaffold on rig package." On July 6, 2016, Nabors "assist[ed] crane operator [to] transfer equipment from main production deck to pipe rack." These jobs all involved the use of the crane, which gives rise to what the court will characterize as a "chicken or the egg" type of problem. Did Nabors remain on the platform to provide Whistler with these services, or was Whistler using these services because it had no alternative until Nabors removed its rig from Whistler's platform? Mr. Pankhurst testified at trial that Whistler attempted to install its own crane so that it would not have to use Nabors' cranes. Because of the way Nabors' cranes were positioned, however, the only place where Whistler could install its crane was in a place that did not allow Whistler to use it for everything. Mr. Pankhurst testified that the parties came to an agreement that for safety reasons, Nabors' crane would be used for unloading boats.[24] Likewise, the Nabors helideck was located atop the

---

[24] Trial transcript dated 12/12/16 at pp. 112-13, R. Doc 636 in bankruptcy case.

living quarters, and those, in turn were on top of Whistler's helideck.[25] Until Nabors removed its rig, Whistler had no alternative but to use the living quarters, helideck and cranes.

The remainder of the activities that Nabors argues constitute inducement consist of activities related to maintenance of the rig, attending the safety meetings and filling out the daily reports. The court finds that there was no inducement by Whistler as to these activities. These activities were incidental to Nabors having its rig on the platform, and the activities were required by BSEE to conform to its regulations.[26] The court finds that after June 20, 2016 the services Whistler knowingly accepted from Nabors for purposes of an administrative claim are limited to the use of the living quarters, the helideck, and the cranes. The court does not find that the services were used voluntarily. The record reflects that Whistler only used those services because Nabors had not yet removed its rig, even though its removal had been requested.

After the contract was rejected on June 20, 2016, there was a delay of approximately 10 weeks until Nabors submitted the demobilization plan on September 8, 2016. Mr. Fox testified that around this time in September, the parties began discussions related to the specifics of demobilization.[27] Once Nabors submitted the proposal for demobilization on September 8, 2016,[28] the record shows that there was back and forth between the parties about the specifics of the demobilization plan as well as activity that needed to take place before demobilization could begin.[29] For example, Mr. Fox testified that there was barite and cement in P-tanks on the drilling rig that Whistler asked Nabors to remove on September 23, 2016.[30] Fox also testified that there was equipment belonging to third parties on the drilling rig. Whistler requested that

---

[25] Trial transcript dated 12/12/16 at p.41, R. Doc 636 in bankruptcy case.
[26] Trial transcript dated 12/12/16 at pp. 114-15, R. Doc 636 in bankruptcy case.
[27] Trial transcript dated 12/13/16 at pp. 73-75, R. Doc. 637 in bankruptcy case.
[28] Trial Exhibit 57, ROA 6241.
[29] Trial transcript dated 12/28/16 at p. 26, R. Doc 643 in bankruptcy case.
[30] Trial transcript dated 12/13/16 at p. 71, R. Doc. 637 in bankruptcy case.

Nabors remove this equipment while demobilizing the rig and transport the third-party equipment back to shore.[31] Nabors and Whistler had to work out the specifics of demobilization, and this included discussions of how to remove and return this third-party equipment that was located on Nabors' rig.[32] Nabors also billed the third-parties for its services.[33] The court finds that after Nabors submitted its demobilization plan on September 8, 2016, some delay was caused to accommodate Whistler's requests with respect to third-party equipment and possibly other matters, and so there was no longer unnecessary delay caused by Nabors.

**B.    The Length of Time Nabors Stayed on the Platform because of Whistler's Post-Petition Needs.**

Nabors filed a motion to require Whistler to assume or reject the Nabors contract on June 17, 2016. On June 20, 2016, Whistler filed a notice into the record stating that it intended to reject the contract. The temporary abandonment of the well had been completed by June 20. Nabors set its motion for hearing on July 13, 2016. At the hearing the court stated that it was granting the motion to reject, and directed Nabors to submit an order, which it did not do until July 20, 2016, at which time the court entered the order. On July 25, 2016 Whistler sent Nabors a formal request for a demobilization plan.[34] The contract with Nabors was for drilling the well, and after June 20, it was clear that Whistler would not be drilling the well, and it seems equally clear that Nabors understood this. It reduced the number of its personnel on the rig on July 1, and again on July 20. As stated above, the court finds that the witness testimony shows the parties were involved in some discussions about whether drilling might recommence, but there is

---

[31] Trial transcript dated 12/13/6 at pp. 73-76, R. Doc. 637 in bankruptcy case.
[32] Trial transcript dated 12/13/16 at pp. 74-75, R. Doc. 637 in bankruptcy case.
[33] Trial transcript dated 12/28/16 at p. 27, R. Doc 643 in bankruptcy case. Trial Exhibit 62, ROA 6301.
[34] Trial Exhibit 56, ROA 6239.

no evidence to show these discussions continued after June 20, 2016. Thus, at most, the latest Nabors stayed on the platform to fulfill Whistler's post-petition needs was June 20, 2016.

The services Nabors provided after June 20, 2016 were provided because Nabors' rig on the platform prevented Whistler from using its own equipment. Whistler's crane could only be set up in a location that made it unsafe to use it for loading and unloading boats. Nabors' living quarters and helideck were on top of Whistler's helideck. Until Nabors demobilized its rig and equipment, Whistler had no choice but to use these items. Once the demobilization occurred, Whistler set up its own cranes and living quarters, and was able to use its own helideck, and it required no further services from Nabors.

Mr. Fox testified that in addition to the equipment and services listed in Trial Exhibit 21, Nabors provided additional services, including substantial infrastructure onshore to support the offshore operation: three rig up yards to offload and load spare parts and equipment for the rig, a main office, a warehouse, a lay down yard in New Iberia, a yard in Fourchon, a corporate office in Houston, multiple degreed professional engineers, a purchasing department, a risk management group, a treasury department, an operations group in Houston, a health, safety and environment group, and a training department. All of this is included in the day rate, and none of this was needed by Whistler after it decided that it would not continue drilling the well it had plugged. The court finds that Whistler's post-petition need for Nabors' services and equipment ended on June 20, 2016.

The court understands the Fifth Circuit's directive that "when the debtor-in-possession induces availability and the bankruptcy estate derives a benefit from it, the ordinary cost of ensuring such availability qualifies as an administrative expense." The unique situation here requires further analysis. Nabors had a rig on Whistler's platform that took significant pre-

12

planning and at least 28 days to remove. Having the rig on Whistler's platform meant that Whistler could not operate or use its own equipment. After Whistler filed a notice that it intended to reject the contract and after Whistler sent a formal request asked for a demobilization plan, Nabors did not respond for over 6 weeks. Whistler had to continue to interact with Nabors to maintain its operations. Whistler clearly had no more need after June 20, 2016 for Nabors' equipment and services. But, it was forced to use some of that equipment because Nabors' rig was still on the platform preventing Whistler from using its own equipment. To saddle the debtor with the costs of $28,000 per day as an administrative expense claim so that it could use a crane, some living quarters and a helideck is not a necessary cost that benefits the estate, such that Nabors should be paid ahead of other creditors. As the Fifth Circuit pointed out, the purpose of section 503(b)(1)(A) is to prevent third parties from refusing to extend credit to debtors-in-possession, not so that a creditor can hold a debtor hostage so it can be paid ahead of other creditors.

**C.     The Actual and Necessary Costs of Staying on the Platform.**

In its decision, the Fifth Circuit stated:

> Whereas Nabors would be entitled to administrative priority for the actual and necessary costs of its presence on the platform for the period of time required to satisfy Whistler's logistical and regulatory requirements, Nabors would not be entitled to administrative expenses for the cost of its presence on the platform for any time attributable to its own unnecessary delay, as such delay neither results from actions by the debtor-in-possession nor benefits the estate.[35]

As stated above, the court finds that Nabors caused unnecessary delay between June 20, 2016 and September 8, 2016. Once the demobilization plan was submitted to Whistler, the parties began discussions intended to facilitate demobilization.

---

[35] *Whistler*, 931 F.3d at 445-46.

On June 20, 2016 when the contract was rejected, Nabors was charging Whistler a day rate of $45,000 per day. This rate dropped to $28,000 per day on July 1, 2016. At trial, Mr. Pankhust testified that Nabors made this reduction because the number of personnel on the rig dropped from 20 to 10.[36] He also testified that Nabors made no further reduction in the day rate when the number of Nabors personnel was reduced from 10 to 3 on July 20, 2016.[37] Conversely, when Nabors added workers on October 11, and again on October 19, 2016 it did not increase the rate.[38] Thus, rather than asking for the actual costs of providing services and equipment to Whistler, Nabors asks the court to use a day rate of $28,000 per day for the entire time. Whistler does not specifically contest this rate, rather it argues that it should only pay for the crane services and living quarters. But the Fifth Circuit has said that the "'actual and necessary costs' should include costs ordinarily incident to operation of a business," so paying only for the crane services and living quarters does not appear to be a choice Whistler has for the time period when Nabors was not the cause of unnecessary delay. The record does not contain a breakdown of the separate value of the various components of the services provided by Nabors that makes up the day rate. Because the court has no other information available to it about the value of the services provided, it will use the day rate of $28,000 per day.

**D.     Conclusion**

The court finds that Nabors has shown there was inducement by Whistler from September 8 to October 19, 2016, which is 41 days. In addition to the amount already awarded by the court in its previous order, Nabors is entitled to an administrative expense claim at the day rate of $28,000 per day, or $1,148,000.00, less any payments Whistler has already made for use

---

[36] Trial transcript dated 12/12/16 at pp. 158-59, R. Doc 636 in bankruptcy case.
[37] Although Pankhurst did not specifically testify as to the date, the record shows Nabors dropped to having three personnel on the rig on July 20, 2016. ROA 5548.
[38] On October 11, Nabors added 7 workers, and on October 19 it added 4 more.

of cranes and living quarters, during that time period. The remainder of the amount Nabors seeks is allowed as a general unsecured claim.

New Orleans, Louisiana, June 30, 2020.

_____
Jerry A. Brown
U.S. Bankruptcy Judge